IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATE OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 1:21-CR-00116-DLF |
| | ) | |
| | ) | |
| VERDEN ANDREW NALLEY | ) | |

### SENTENCING MEMORANDUM

COMES NOW, the Defendant, VERDEN ANDREW NALLEY ("Mr. Nalley"), by and through undersigned counsel, and herby files this sentencing memorandum in support of a sentence other than incarceration.

**I.  PRELIMINARY STATEMENT**

Mr. Nalley is a nonviolent first offender. He pled guilty to entering the Capitol building on January 6, 2020 without authority, a misdemeanor. He did not engage in violence or damage property. He was arrested, spent three days in jail, and was released on very restrictive bond conditions. After three months of house arrest, he was moved to curfew, and then stand-alone GPS monitoring several months later. His Guidelines call for probation. Mr. Nalley asks for a sentence of time served followed by a year of supervision. This sentence serves all of the factors in 18 U.S.C. § 3553.

## II.   FACTS

Mr. Nalley is a fifty year old skilled carpenter who decided to travel to Washington D.C. to attend the political rallies on January 6, 2020. That day, after the speeches at the Washington Monument, he and his friend, along with hundreds of others, walked to the Capitol. Mr. Nalley entered the Capitol, following the crowd. He walked around the common areas, took some pictures, and left. He was there approximately 30 minutes. (Statement of Facts, ¶ 10). He committed no act of property damage or violence toward any individual. He drove back to Georgia that same night. (Id. at ¶ 11).

More than a year later, on February 16, 2021, Mr. Nalley was arrested at a RaceTrac gas station located at 2682 Buford Dr., Lawrenceville, Georgia 30043, pursuant to a February 12, 2021 arrest warrant which issued out of the United States District Court for the District of Columbia. *See 1:21-mj-00040*, Doc 1. On February 1, 2021, Mr. Nalley was stopped at the same RaceTrac by FBI agents who had followed him there; he immediately cooperated, was interviewed, and explained his presence in Washington D.C. that day. He also allowed the agents to look at his phone. So, on February 16, 2021, when agents phoned Mr. Nalley to come back to the RaceTrac to meet under the guise of signing some papers, of course, he complied. He was taken into custody.

Mr. Nalley was taken to a local county jail overnight before being transported the following morning, February 17, to the custody of the U.S. Marshal Service in Atlanta.[1] On February 17, 2021, Mr. Nalley made his initial appearance in the Northern District of Georgia, and the undersigned was appointed counsel. The government moved for detention. *1:21-MJ-00151-CCB*, Doc. 5. On February 19, 2021, Mr. Nalley was released on a $10,000 unsecured bond, having already spent three days in jail. *Id.* at Docs. 9, 10.

Mr. Nalley's conditions of release were stringent. Mr. Nalley was placed on home detention with a GPS leg monitor (for which he was to pay all costs) and ordered to live with Ms. Bobbie Peppers, his girlfriend, at her address, 2637 Rock Springs Road, Buford, Georgia 30519. *Id.* at Doc. 9, ¶ (7)(n),(o), (t). Judge Bly restricted Mr. Nalley to his home except for work, medical appointments, and legal visits. Any work schedule had to be submitted to his supervising probation officer the Friday before the upcoming work week. He was also ordered to participate in drug testing.[2]

---

[1] The PSR's cover page, under the heading "Release Status," misses the mark a bit. He was arrested on February 16 and stayed the night at a local jail before his initial appearance on February 17 (not February 19) in federal court in Atlanta. His detention hearing was on February 19, when he was released on a signature bond. *See 1:21-MJ-00151-CCB* (Docket).

[2] On April 26, 2021, Mr. Nalley and counsel appeared remotely before Magistrate Judge G. Michael Harvey in the District of Columbia for an initial appearance and arraignment. During this proceeding, Mr. Nalley was placed on

3

Due to limited work opportunities, Mr. Nalley was effectively unable to leave his home for approximately *three months*. On May 4, 2021, during a status conference before the Honorable Judge Dabney L. Friedrich, Mr. Nalley requested that his conditions of release be modified to remove the home detention condition and impose a curfew. With no opposition from the government and citing compliance on the part of Mr. Nalley, the Court, by Minute Order, granted this request and set a curfew between the hours of 10:00 p.m. and 6:00 a.m.

Despite being free from home incarceration, Mr. Nalley continued to struggle to secure and maintain consistent employment in his field as a skilled carpenter, drywall installer, and tile worker. Thus, on October 20, 2021, Mr. Nalley, through counsel, requested the ability to travel to Martin County, Florida for two significant remodeling projects. (Doc. 67). First, a home located at 4648 SE Park Dr., Stuart, Florida 34997, needed a complete interior demolition and rebuild. In addition to the house remodel in Stuart, Mr. Nalley had the opportunity to do renovation and restoration work on a 76-foot yacht located in Hobe Sound, about

---

conditions of release in the District of Columbia which incorporated those from the Northern District of Georgia, plus the additional requirement to stay out of the charging district except when required for Court appearances or related activities.

a twenty-minute drive from the Stuart house.[3] The Court granted Mr. Nalley's unopposed motion by Minute Order.[4]

So, for the past four months, Mr. Nalley has been travelling to Florida to work. While there, Mr. Nalley lives in the Stuart home and performs work during two-week stretches. He then returns to his home in Buford, Georgia for several days in between and reports to his supervising officer. He has been in complete compliance with all of the conditions of his release since February 19, 2021, including all modifications.

Since his arrest on February 16, 2021, Mr. Nalley has spent 3 days in jail, 3 months on house arrest, and then roughly 6 months under a curfew before being allowed to travel to Florida for work. Once allowed to travel, however, Mr. Nalley faced a harsh reminder of the poor decision he made on January 6 to enter the Capitol.

Mr. Nalley and Ms. Peppers have travelled to Florida approximately 6 times to work on the Stuart house renovation project. They flew for all but one trip. Each time they fly, at the ticketing counter, the ticketing agent takes their identifications

---

[3] This work would utilize Mr. Nalley's expert carpentry skills.

[4] The GPS leg monitor remained in place for stand-alone monitoring. This provided an extra level of accountability despite the pretrial services officer in Georgia indicating that its removal would typically be supported after 6 months of compliance. Mr. Nalley did not oppose the continued measure.

and leaves to seek approval to issue a boarding pass due to what they are told is a "red flag." This has resulted in delays of up to 45 minutes. After receiving their boarding passes, Mr. Nalley and Ms. Peppers are then singled out at the TSA checkpoint, pulled to a separate area, patted down, swabbed, and their luggage dumped and searched, all prior to walking through their own private scanner. Later, at the gate, each time, they experience an announcement for "random" screenings by a team of TSA agents. They are then pulled aside, swabbed, and their luggage searched again. They have not seen anyone else go through this procedure at the gate.

### III. ARGUMENT

A sentence of time-served with 1 year of supervised release to follow would serve all of the statutory sentencing goals of 18 U.S.C. § 3553.

#### A. The Sentencing Guidelines and the Circumstances of the Offense Weigh in Favor of Alternatives to Incarceration.

*The Sentencing Guidelines*

Mr. Nalley entered into a negotiated guilty plea to a violation of 18 U.S.C. § 1752(a)(1), knowingly entering a restricted building. (PSR, ¶ 8). This is a Class A misdemeanor with an authorized term of imprisonment of up to 12 months. (*Id*. at ¶ 83). Based upon an offense level of 4 and a criminal history category I, his advisory range is 0-6 months, in Zone A of the Sentencing Table. (*Id*. at ¶ 84). The Guidelines and their commentary recommend a sentence of straight probation.

More and more, the United States Sentencing Commission is attempting to refine an approach that is less rigid and more attuned to individual cases. Those attempts are commendable and part of the larger picture, but ultimately 18 U.S.C. § 3553 controls. That said, most recently, the Sentencing Commission amended the guidelines to expand the circumstances where no imprisonment is officially suggested. On November 1, 2018, the commentary to U.S.S.G. § 5C1.1, entitled "Imposition of a Term of Imprisonment," was amended in a way which demonstrates a recognition by the Commission that incarceration is not always the answer. Specifically, Application Note 4 now provides: "If the defendant is a nonviolent first offender and the applicable guideline range is in Zone A or B of the Sentencing Table, the court should consider imposing a sentence other than a sentence of incarceration. . . ." U.S.S.G. § 5C1.1, Application Note 4. This application note recommends probation without any condition requiring community or home confinement for folks in Zones A or B that have little-to-no criminal history.[5]

The Commission explained the amendment as being consistent with the statutory language in 28 U.S.C. § 994(j) regarding the "general appropriateness of

---

[5] For Zone B, U.S.S.G. § 5C1.1 recommends some form of confinement as a condition of probation, e.g., community or home detention. The amended note, however, suggests no such condition for those in Zone B without criminal history.

imposing a sentence other than imprisonment" for a first offender who has not been convicted of a violent offense. U.S.S.G. § 5C1.1, Amendment 811 (November 1, 2018). The Commission also noted that the change is consistent with a recent recidivism study conducted by the United States Sentencing Commission which demonstrated that offenders with zero criminal history points have a lower recidivism rate than offenders with one criminal history point, and that offenders with zero criminal history points and no prior contact with the criminal justice system have an even lower recidivism rate. *See* Tracey Kyckelhahn & Trishia Cooper, U.S. Sentencing Com'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* at 6-9 (2017). *Id.*[6]

To be clear, Zones A and B cover advisory ranges extending from 0 months, where the criminal history category is low, to as high as 15 months, where the offender has more criminal history. *See* U.S.S.G. at Sentencing Table. Accordingly, even within the *higher ranges* of Zone B, where more criminal history is involved (and the range is as high at 15 months), the guidelines provide the option of alternative sentencing, i.e., probation that includes a term of community or home confinement. U.S.S.G. § 5C1.1(c)(3). That is not Mr. Nalley, who is in Zone A.

---

[6] This recidivism study is also highly relevant to whether the goals of general and specific deterrence would be served by a term of incarceration for a first offender with lower ranges of punishment suggested in the Sentencing Table. They would not.

8

Again, regardless of zone, the guidelines are advisory, and the Court has the discretion to fashion any sentence, including straight probation, which is authorized by the governing statutes. *See* 18 U.S.C. § 3561(a) (probation option). Thus, it makes even more sense, in light of the Sentencing Commission's most recent statement on incarceration for first offenders, to meaningfully examine all viable options for defendants with no criminal history points such as Mr. Nalley.

Here, Mr. Nalley's criminal history is negligible. When he was 18 years old he pled nolo contendere and was fined for trespass and possession of a misdemeanor quantity of marijuana. (PSR at ¶ 47). He is now fifty years old and has no other convictions. Mr. Nalley is effectively a first offender. And, he is nonviolent. He has never suffered a conviction for violence or involving a weapon. His sentencing range of 0-6 months, Zone A, fits squarely within the zone where the Commission's suggests a sentence other than incarceration. In this situation, probation would be a Guidelines sentence.

### *The Offense*

Mr. Nalley is not offering an excuse for his conduct. In fact, he accepted responsibility from day one when stopped by the FBI at the RaceTrac. He admits and regrets that he knowingly entered the Capitol building at a time when it was restricted and things were getting out of control. He was caught up in the events of January 6, including the political speeches. That said, at bottom, Mr. Nalley's

offense is a trespass. The fact that it was a trespass when others were doing the same does not necessarily aggravate his actions, but rather, gives context to it, as he followed the tide of others into the building.

Again, Mr. Nalley did not do any property damage. Nor did he touch or harm anyone or threaten to do so. He walked in and walked out. He did not go to private chambers or offices. He stayed in common areas and then left. Mr. Nalley travelled to Washington with a friend whom he played music with in a rock bank in Georgia. He travelled with no one else. And, he left with the same person, that same evening.[7]

Mr. Nalley's presence in the Capitol that day is appropriately punished as a misdemeanor without additional incarceration. Notably, Mr. Nalley pled to 18 U.S.C. § 1752(a)(1), not § 1752(a)(2). Section 1752(a)(2) punishes disorderly or disruptive conduct. Mr. Nalley, by contrast, knowingly entered a restricted building without lawful authority, § 1752(a)(1). *He* did not engage in disorderly or disruptive conduct; he entered and remained without authority. Of course, both offenses authorize 0-12 months of custody, but Mr. Nalley's offense is the least serious version of offense under § 1752(a) which, in addition to Mr. Nalley's less

---

[7] Mr. Nalley's friend and bandmate, William Calhoun, Jr., is a lawyer from Americus, Georgia. By contrast, Mr. Nalley quit school after the ninth grade. He has worked as a roofer, carpenter, and drywall and tile installer his whole life.

serious offense, outlines several offenses requiring disorderly, obstructive, or violent conduct. *See* 18 U.S.C. § 1752(a)(2) – (5).

It is also important to recognize that Mr. Nalley's offense occurred on January 6, not during the days that followed. His crime involved his actions on that day, not impulsive, ill-advised words posted on social media two days later. As the PSR points out (and undoubtedly the government will highlight), Mr. Nalley took to social media on January 8. (PSR at ¶ 29). There, he posted what appears to be a response to media reports about the day (including photos), contradicting notions that there was violence or weapons (at least that he saw), then, perhaps in defiance of those reports, stating that the people will come back with guns to take their country back. (*Id.*). Mr. Nalley's January 8 political rant on social media does not change the fact that he did not threaten or do violence on January 6. He was not even convicted of disorderly conduct. His social media posts were sound and fury signifying nothing. In fact, during his February 1 interview with the FBI, Mr. Nalley explained that he was parroting statements made by others.

The sentencing guidelines for nonviolent first offenders, and the circumstances surrounding the offense, including Mr. Nalley's reaction when confronted by agents, warrants a sentence which includes alternatives to incarceration. He immediately cooperated, admitted wrongdoing, and pled guilty.

Here, Mr. Nalley is technically asking for a sentence that is *not* probation, but rather, asks the Court to credit the *actual incarceration* he already has served – three days – to be followed by one (1) year of supervised release, the maximum authorized for his offense. Additional incarceration is not needed to serve the statutory sentencing goals of § 3553, particularly since he has already done 3 months of home incarceration and 6 months of curfew as part of the conditions of his release. The Guidelines agree. U.S.S.G. § 5C1.1, Application Notes 2 and 4. Moreover, he has been on, and paid for, a GPS leg monitor for a year. A time-served sentence with restitution and community service is sufficient but not greater than necessary to serve § 3553(a). Moreover, it is in line with comparable sentences being imposed in this district.[8] There does not appear to be an aggravating circumstances which would merit additional incarceration especially given Mr. Nalley's service of jail time and restrictive conditions of release.

### B. Mr. Nalley's Personal History and Characteristics Weigh in Favor of a Sentence Without Additional Incarceration or Detention.

Mr. Nalley has worked virtually his whole life as a skilled roofer and carpenter. He did not continue past ninth grade in school. He grew up in a modest

---

[8] Counsel has reviewed the growing Appendix of dispositions which the government files in these cases and notes that the majority have involved the imposition of probation with or without home detention. Time served would be a custodial sentence, arguably harsher than probation.

12

and humble home in Gwinnett County, Georgia. His father installed water and sewer pipeline under residential developments in Cobb County, Georgia. His parents divorced when he 3 years old. Mr. Nalley was raised by his mother and stepfather, but his father remained a presence in his life. Nevertheless, it was a broken family with some level of turbulence.

Mr. Nalley had a defiant period as a teenager and left school in the ninth grade to work as a roofer. He later found a committed companion and started a family of his own. His work as a roofer allowed him to provide for his kids. Mr. Nalley's daughter, 31, works as a cook at Waffle House. His son Zach, 28, works at Amazon. Both live in Flowery Branch, Georgia, near Mr. Nalley. Mr. Nalley separated from their mother after 18 years. He has been in a committed relationship with Bobbie Peppers for the past seven years. Ms. Peppers works as a home health aide.

Mr. Nalley has lived in Georgia his whole life, except for nine months when he lived in Florida with Ms. Peppers. He had never been to Washington D.C. until he drove there on January 5, 2020 with his bandmate William Calhoun, Jr. Mr. Nalley's passion is playing blues and rock music at local bars and barns. He used to do that with Mr. Calhoun. They no longer speak. Over the course of his life, he has become a very skilled carpenter. Work in the field, however, has been

sporadic, especially during the last year on bond. Since January 6, his life has been a struggle.

Mr. Nalley is fifty years old. He is not a threat to anyone. His passion about the 2020 election was stoked by media coverage and the inflammatory rhetoric of the speeches he attended. He was emboldened by the masses and followed them into the Capitol. His thirty minutes inside the Capitol have reverberated now for over two years. His presence in Washington D.C. was a once-in-a-lifetime trip, one he now wishes to forget. He has no plans to ever return. He has been to jail, been confined to his home for months, had a GPS strap on his leg for a year, and been treated as a terrorist at the airport. All the while, he has complied with the letter of his conditions or release. He no longer has any social media accounts and does not plan to in the future.

Mr. Nalley has only one conviction – a nolo contendere plea from when he was 18 years old. He has no other criminal convictions in 32 years. He cooperated fully with the FBI from the moment agents stopped him on February 1, 2021. They interviewed him, and he admitted what he did. He allowed them to search his phone. This was over a year after the events of January 6.

Mr. Nalley's age, his lack of criminal history, his work history, his reaction to law enforcement, and his performance over the last year all reflect his true character. These characteristics far outweigh his thirty minutes of bad judgment

on January 6. However, even with no additional incarceration, Mr. Nalley's journey is not over. At a minimum, he will be subject to another year of supervision and potentially weeks of community service. Mr. Nalley's personal history and characteristics support the sentence he requests.

### C. Alternatives to Incarceration Serve the Sentencing Goals of 18 U.S.C. § 3553.

When there is discussion about alternatives to imprisonment, the knee jerk reaction is to conclude that such an option undermines respect for the law and the need for just punishment, 18 U.S.C. § 3553(a)(2)(A). This reaction is unjustified.

Take probation, as an example, a sentencing option which does not involve incarceration in a federal institution. A sentence of probation is not absolution. Through such a sentence, a court does not turn a blind eye to crime or reward the offender's misdeeds.

The Supreme Court itself has proclaimed the virtues – and impositions – of an offender's probationary sentence. "Probation, like incarceration, is a form of criminal sanction imposed by a court upon an offender." *United States v. Knights*, 534 U.S. 112, 119 (2001) (citation omitted). "Probation is one point . . . on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service." *Id.* (citations omitted). The Supreme Court has embraced the view of probation as a corrective device:

> Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled. . . . Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens.

*Id*. "We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty." *Gall v. United States*, 552 U.S. 38, 48 (2007) (emphasis added). "Probation is not granted out of a spirit of leniency. . . . [P]robation is not merely 'letting an offender off easily.'" *Gall*, 552 U.S. at 48 n.4 (citation omitted). "[T]he probation . . . conditions imposed on an individual can have a significant impact on both that person and society. . . . Often these conditions comprehensively regulate significant facets of their day-to-day lives." *Id*. (citation omitted). Indeed, in *Gall*, 552 U.S. at 49, the Supreme Court approved a probationary sentence where the guideline range was 30-37 months imprisonment for a drug conspiracy crime.

Here, the impacts referred to by *Gall* have already been felt by Mr. Nalley during the year following his incarceration for three days. And, these impacts will continue even if the Court agrees with Mr. Nalley's request for a time-served sentence and one year of supervision. Mr. Nalley's suggested sentence is not absolution or turning a blind eye to his misdeeds. Rather, it is a sentence calibrated to his crime and his unique failings as a person.

## IV. CONCLUSION

Mr. Nalley made a very poor decision on January 6. He regrets his actions and has accepted responsibility from day one. He cooperated with the government, pled guilty, and has been working (or trying to work) and abiding by the law on pretrial release for a year. Mr. Nalley respectfully request that the Court grant his request and impose a time-served sentence, followed by 1 year of supervised release.

This 3rd day of March 2022.

                                        Respectfully submitted,

                                        */s/ Thomas L. Hawker*
                                        THOMAS L. HAWKER
                                        GEORGIA BAR NO. 338670
                                        ATTORNEY FOR VERDEN NALLEY

FEDERAL DEFENDER PROGRAM, INC.
Suite 1500, Centennial Tower
101 Marietta Street, N.W.
Atlanta, Georgia 30303
(404) 688-7530 Fax (404) 688-0768
Thomas_Hawker@fd.org

CERTIFICATE OF SERVICE

I hereby certify that the Sentencing Memorandum has been formatted in Book Antiqua 13 pt., and was filed by ECF this day with the Clerk of Court with a copy served by ECF notice upon counsel of record as follows:

        Jennifer M. Rozzoni, Esq.
        Assistant United States Attorney

This 3rd day of March 2022.

        */s/ Thomas L. Hawker*
        THOMAS L. HAWKER
        GEORGIA BAR NO. 338670