**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00116 (DLF)** |
| **v.** | : | |
| | : | |
| **VERDEN ANDREW NALLEY,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Verden Andrew Nalley ("Nalley") to 14 days' incarceration, one year of supervised release, 60 hours of community service, and $500 restitution.

**I.    Introduction**

The defendant, Verden Andrew Nalley, a 50 year-old construction worker, and his friend and co-defendant William McCall Calhoun ("Calhoun"),[1] participated together in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

Nalley pleaded guilty to an information charging one count of 18 U.S.C. § 1752(a)(1), Entering or Remaining in a Restricted Building or Grounds, a Class A misdemeanor. As explained herein, a sentence of 14 days' incarceration is appropriate in this case because: (1) Nalley followed

_____

[1] Calhoun is Nalley's co-defendant in this case. He has rejected the government's plea offer and it appears he plans to exercise his right to a trial.

crowds into the Capitol building knowing that it was a restricted building and that certification of the election was supposed to take place; (2)  he stayed inside the building walking around for 30 to 40 minutes taking photos and documenting his experience; (3) his social media posts after January 6 revealed a lack of remorse for his behavior; and (4) he actively spread false information on social media by downplaying the violence on January 6 and threatening to "be back with guns in two weeks if [the election results were] not fixed."

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the Congressional certification vote of the 2020 Presidential election.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 78 (Statement of Offense), at 1-6. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

### Verden Nalley's Role in the January 6, 2021 Attack on the Capitol

On January 5, 2021, Verden Nalley and William Calhoun traveled to Washington, D.C., from their homes in Georgia to attend the Stop the Steal rally.  They arrived late in the evening on January 5 and stayed the night in a hotel approximately 20 minutes outside of Washington, D.C. The following morning, they drove into Washington, D.C. and attended the former President's rally. After the speeches, Nalley and Calhoun followed the crowd of people moving towards the

Capitol building. Nalley was aware and knew that Vice President Mike Pence was planning to certify the 2020 Presidential Election that afternoon. He also knew and understood that people were upset that Vice President Pence was going to do so.

Nalley and Calhoun first made their way up the stairs on the west side of the Capitol, under the scaffolding with throngs of other people. They are seen in Image 1 climbing the stairs—Nalley circled in red and Calhoun circled in yellow.

*Image 1*



Nalley and Calhoun entered the Capitol building around 2:19 pm, approximately six minutes after the first breach of the building, through the Senate wing doors as shown in Image 2. Nalley is circled in red and Calhoun is circled in yellow.

*Image 2*



At this point, broken windows are seen on the right side of the image and shards of glass are on the ground. Nalley and Calhoun turn right and head south down the hallway. They make their way down to the crypt where Nalley takes photographs of the crowds as seen in Images 3 and 4.

*Image 3*                        *Image 4*

        

Nalley and Calhoun are in the crypt area when the police line is broken and move through the crypt towards stairs that wind up to the rotunda. Image 5 depicts Nalley after the police line is broken in the crypt and prior to his making his way to the rotunda area.

*Image 5*



Nalley and Calhoun find their way to the rotunda area where they walk around as seen in Images 6 and 7.  Nalley is circled in red in Images in 6 and 7. Calhoun is circled in yellow in Image 7.



*Image 7*



Nalley and Calhoun remain in the Capitol building for a total of 30 to 40 minutes and eventually make their way out, find their car, and drive home to Georgia.

In the following days, Nalley shows little remorse for his behavior, and in fact contemplates returning to the Capitol again.  On January 8, 2021, a group named "Atlanta Antifascists," posted screenshots on Twitter of several posts from Nalley from a "MeWe" chat group.[2]  In the first post, Image 8, he posted a photo from the crypt area claiming that the "media is telling you lies," and warned that if "we have to come back we will bring guns and take our country from them."

*Image 8*





Verden Nalley                                                                      8:37 AM

Verden Nalley

The media is telling you lies we took the capital with no weapons only to show them We The People out number the government 10 thousand to 1 if we have to come back we will bring guns and take our country from them                                                             8:40 AM

Approximately 40 minutes later, he talks more about the Capitol, his reasons for being there, and admits to having been inside (Image 9).

---

[2] "MeWe" is an online social network found at www.mewe.com.

*Image 9*



And after another 40 minutes, he warns a second time of going "back with guns in two weeks if it's not fixed" (Image 10). Based on the context of the posts, he is talking about "fixing" the results of the 2020 election.

*Image 10*



*Verden Nalley's Interview*

Nalley voluntarily agreed to an interview with the FBI prior to his arrest, but after Calhoun had been charged and arrested. He admitted that he drove to Washington, D.C. with Calhoun in Nalley's vehicle on January 5, 2021. He further explained that they drove into the city on January 6 and listened to the speeches from the former President and others. At some

8

point crowds began to walk toward the Capitol and Nalley and Calhoun followed. The two men entered the building. Nalley claimed they faced no resistance upon entry. He further said he spoke to officers inside and did not engage in any violence or destruction of property. After walking around for 30 to 40 minutes, Nalley told agents that he and Calhoun left the building and drove home.

*The Charges and Plea Agreement*

On February 12, 2021, a federal grand jury returned an indictment charging Nalley and Calhoun with violating 18 U.S.C. § 1512(c) and (k), 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2). ECF 6. On February 19, 2021, Nalley was arrested in the Northern District of Georgia. On December 2, 2021, he pleaded guilty to an Information, charging him with Entering or Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. §§ 1752(a)(1). Pursuant to the terms of his agreement with the Government, Nalley acknowledged that the charge of 18 U.S.C. §1752(a)(1) carries a maximum sentence of one year imprisonment, a one-year term of supervised release, a fine of no more than $100,000, and a mandatory special assessment of $25.  He also agreed to pay restitution in the amount of $500 to the Department of the Treasury.

### III.    Statutory Penalties

Nalley now faces sentencing for Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to one year of imprisonment, a fine of up to $100,000, and a term of supervised release of not more than one year. The defendant must also pay restitution. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). By plea agreement, the parties have agreed that the riot caused approximately $1.5 million of damage to the United States Capitol, and Nalley has agreed to pay restitution in the

amount of $500. That restitution should be paid to the Clerk of the Court, who shall forward the payments to the Architect of the Capitol as indicated in the Presentence Investigation Report ("PSR"). PSR at ¶ 107.

## IV.   The Sentencing Guidelines and Guidelines Analysis

Because Nalley pled guilty to a Class A misdemeanor, the Sentencing Guidelines are applicable. In cases where the Guidelines are applicable, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Nalley's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | 2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 37-45.

The U.S. Probation Office calculated Nalley's criminal history as a category I, which is not disputed. *Id*. ¶ 48. Accordingly, the U.S. Probation Office calculated Nalley's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at 0-6

10

months. *Id*. ¶¶ 45, 84. Nalley's plea agreement contains an agreed-upon Guidelines calculation

that mirrors the U.S. Probation Office's calculation.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens

of thousands of sentences and worked with the help of many others in the law enforcement

community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita*, 551

U.S. at 349. As required by Congress, the Commission has "'modif[ied] and adjust[ed] past

practice in the interests of greater rationality, avoiding inconsistency, complying with

congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007);

28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its

determinations on empirical data and national experience, guided by professional staff with

appropriate expertise,'" and "to formulate and constantly refine national sentencing standards."

*Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the

Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States
> Sentencing Commission's in-depth research into prior sentences,
> presentence investigations, probation and parole office statistics,
> and other data. U.S.S.G. §1A1.1, intro, comment 3. More
> importantly, the Guidelines reflect Congress's determination of
> potential punishments, as set forth in statutes, and Congress's
> on-going approval of Guidelines sentencing, through oversight of
> the Guidelines revision process. See 28 U.S.C. § 994(p) (providing
> for Congressional oversight of amendments to the Guidelines).
> Because the Guidelines reflect the collected wisdom of various
> institutions, they deserve careful consideration in each case.
> Because they have been produced at Congress's direction, they
> cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both*

determine that the Guidelines sentences is an appropriate sentence for the case at hand, that

sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary'

requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

## V.     Sentencing Factors Under 18 U.S.C. § 3553(a)

The Court should next consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49-50. Under § 3553(a), "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

Here, Nalley's criminal conduct includes aggravating factors that should raise concern for this Court. Nalley knew and understood that the certification was happening at the Capitol building on January 6 and followed the crowds to the building, a restricted area, anyway. He entered the building approximately six minutes after it was initially breached at the Senate wing doors. While no police officers blocked his path, there were clear signs of violent entry. The window adjacent to the door through which Nalley passed had been smashed out. Nalley and Calhoun would have heard a loud, high-pitched, continuous beeping, similar to a smoke alarm sounding throughout the Capitol Rotunda and its antechamber (an area Nalley admits to having been in). Nalley and Calhoun found their way into the crypt area and soon after were part of a crowd that breached an established police line. They moved through the crypt and up a set of stairs to the rotunda and eventually left the building. Overall, Nalley and Calhoun spent 30 to 40 minutes inside, despite what was clearly chaos going on around them. Finally, in the days soon after, Nalley showed no remorse for his actions and in fact celebrated his behavior on social media advertising repeatedly that rioters far outnumbered officers on January 6 and warning that he would be back "with guns in two weeks" if the election was not fixed.

Accordingly, the nature and the circumstances of this offense establish the need for a sentence of some incarceration in this matter.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, Nalley is a 50 year-old man from Buford, Georgia. PSR at 3.  Aside from a nine-month stay in Florida, he has lived in Georgia his entire life. *Id*. ¶ 66. Nalley left school in ninth grade and began work as a roofer. *Id*. ¶ 74. Since that time, he has always worked in the construction industry and considers himself a skilled roofer and motorcycle mechanic. *Id*. ¶¶ 74-77.

According to the PSR, Nalley did not provide the required documentation relating to his assets, liabilities, and monthly cash in-flows and out-flows, which required the Probation Office to conduct independent research through commercial government tracking sources to complete a financial analysis. PSR ¶¶ 79-82. Thus, it remains unclear whether Nalley is in a position to pay a fine in this case. Regardless, Nalley's history and characteristics reveal a man with steady employment and a steady homelife and someone who knew better than to break the law on January 6.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. Many who participated in the riot intended to delay or even prevent of the most important democratic processes we have: the peaceful transfer of Presidential power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188 (RDM):

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 24-25 ("What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government. . . . [and those who committed] violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

16

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188 (RDM), Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Nalley's actions – during and after the riot – demonstrate the need for specific deterrence. As stated above, he joined a mob that unlawfully entered the Capitol building and spent at least a half an hour walking around the building. Afterward, he boasted about having been at the scene and threatened to return with firearms in "two weeks if it's not fixed." He demonstrated no real recognition of wrongdoing until he pled guilty and accepted responsibility.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[4] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A

---

[4] Attached to this supplemental sentencing memorandum is a table (Exhibit A) providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

probationary sentence should not necessarily become the default.[5] Indeed, the government invites

the Court to join Judge Lamberth's admonition that "I don't want to create the impression that

probation is the automatic outcome here because it's not going to be." *United States v. Anna*

*Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 (statement of Judge Lamberth).

Avoiding unwarranted disparities requires the Court to consider not only a defendant's

"records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression

of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350,

1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who,

unlike the defendant in Hemphill, pleaded guilty and cooperated with the government). Sentencing

courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g.,*

*United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d

1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The

Capitol breach was sui generis: a mass crime with significant distinguishing features, including

the historic assault on the seat of legislative branch of federal government, the vast size of the mob,

the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of

violence by a substantial number of rioters against law enforcement officials, and large number of

---

[5]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the exact same balance of aggravating and mitigating factors present here, the Court may consider prior sentences imposed on January 6 defendants who, like Nalley, pleaded guilty to violating 18 U.S.C. 1752(a)(1).

In *United States v. Courtright*, 1:21-cr-72 (CRC), Courtright briefly entered the Senate floor area, temporarily seized U.S. government property, attempted to break into locked doors, and made inflammatory social media posts. Courtright was sentenced to one month of incarceration, 12 months of supervised release, 60 hours of community service, and $500 restitution.

In *United States v. Ridge*, 21-cr-406 (JEB), Ridge used electronic communications to express his intention to block Congressional proceedings, recorded video of unlawful activity inside the Capitol Building, and boasted on social media after leaving the Capitol that he had stormed the Capitol and others had broken down doors. Ridge was sentenced to 14 days consecutive incarceration, $1000 fine, 1 year supervised release, 100 hours community service, and $500 restitution.

In *United States v. Tryon*, 21-cr-420 (RBW), Tryon resisted law enforcement's attempt to prevent him from entering the Capitol Building, undeterred by the police and being pepper-sprayed and hit with a baton - entered the Capitol anyway after witnessing a rioter break a window and open a door, boasted to a YouTuber that he had been pepper-sprayed and beaten with a baton and expressed his desire to enter the Capitol to disrupt Congress. Tryon was sentenced to 50 days incarceration, one year of supervised release, $500 restitution, and a $1,000 fine.

In *United States v. Schornak*, 21-cr-278 (BAH), Schornak communicated with others about his intent to engage in combative behavior prior to January 6. He arrived in Washington, D.C. with tactical gear and a bullhorn. He entered the Capitol building through doors that were adjacent to visibly broken windows and then recorded the unlawful activity going on around him. Finally, he stole an American flag and paraded with it while in the crypt area of the building. Schornak was sentenced to 36 months' probation, with a condition of his probation to include two 14-day periods of incarceration and two months of home detention, and $500 restitution.

In *United States v. Adam Johnson*, 21-cr-648 (RBW), Johnson ran towards the Capitol after hearing it had been breached and recorded a video of rioters assaulting and disarming police officers outside the Capitol. He witnessed officers use tear gas and flash bang devices to disperse the crowd, yet persisted in breaching the Capitol through the Senate Wing Door, alongside rioters who were entering through a smashed window. He climbed a staircase to the second floor and traveled all the way to the doors to the House Chamber. He tried to open a door he believed was to Speaker Pelosi's office, shortly after her staffers had barricaded themselves against the mob just across the hall and temporarily stole and carried the Speaker's podium to the Rotunda for a "photo op." Johnson was also part of a mob that overwhelmed a line of police guarding the entryway to the House Chamber and crushed officers during its advance. He witnessed rioters attempt to break down the doors to the House Chamber and encouraged them by shouting that a bust of George Washington would make "a great battering ram." Finally, he destroyed evidence by deleting videos and photographs from his cell phone as well as his entire Facebook account. Johnson was sentenced to 75 days incarceration to be followed by one year of supervised release. He also was fined $5000 and was ordered to pay $500 in restitution.

Finally, in *United States v. Annie Howell*, 21-217 (TFH), Howell was preparing for violence prior to the attack, including discussing plans for bail, the acquisition of tear gas, and meeting with Proud Boys. She was aware of the potential for violence because, before she headed to the U.S. Capitol on January 6, she knew rioters had breached defensive perimeters established by police. She witnessed violence between other rioters and law enforcement officers before entering the building, including the siege at the Lower West Terrace tunnel entrance, where she recorded several videos of the pitched battle between rioters and police, and then shared them on social media websites on January 6. She climbed through a broken window to enter the Capitol and sent messages and video to others from inside. Howell also made statements on social media during and after the riot showing a lack of remorse, including falsely blaming the law enforcement officers for the violence on January 6. Finally, she likely destroyed evidence as indicated by missing social media posts and the fact that she reset her mobile device 20 days after the riot. Howell was sentenced to 36 months' probation with a condition of her probation to include 60 days of intermittent confinement in segments of 10 days to be served at a local jail, 60 hours of community service, and $500 in restitution.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence

differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Conclusion

For all of the factors set forth above, the government recommends that this Court sentence Verden Nalley to 14 days' incarceration, one year of supervised release, 60 hours of community service, $500 in restitution and the mandatory $25 special assessment. Such a sentence protects the community, promotes respect for the law, and deters future crime and is "sufficient but not greater than necessary" to accomplish the goals of 18 U.S.C. § 3553(a)(3).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
DC BAR NO. 481052


By:    _____/s/_____
JENNIFER M. ROZZONI
New Mexico Bar No. 14703
Assistant United States Attorney
Detailee
U.S. Attorney's Office
201 Third Street, NW
Albuquerque, New Mexico 87102
Tele: 505-350-6818
jennifer.m.rozzoni@usdoj.gov