```
 1                    BEFORE THE UNITED STATES DISTRICT COURT
                          FOR THE DISTRICT OF COLUMBIA
 2

 3     UNITED STATES OF AMERICA,        .
                                        .  Case Number 21-cr-116-2
 4              Plaintiff,              .
                                        .
 5          vs.                         .
                                        .
 6     VERDEN ANDREW NALLEY,            .  March 10, 2022
                                        .  12:39 p.m.
 7              Defendant.              .
       - - - - - - - - - - - - - - - - -
 8

 9                       TRANSCRIPT OF SENTENCING HEARING
                     BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                       UNITED STATES DISTRICT JUDGE

11

12     APPEARANCES:

13     For the United States:      JENNIFER ROZZONI, AUSA
                                   United States Attorney's Office
14                                 201 3rd Street NW
                                   Suite 900
15                                 Albuquerque, New Mexico 87102

16     For the Defendant:          THOMAS HAWKER, AFPD
                                   Federal Public Defender's Office
17                                 101 Marietta Street NW
                                   Centennial Tower
18                                 Suite 1500
                                   Atlanta, Georgia 30303
19

20     Official Court Reporter:    SARA A. WICK, RPR, CRR
                                   United States District Court
21                                    for the District of Columbia
                                   333 Constitution Avenue Northwest
22                                 Room 4704-B
                                   Washington, D.C. 20001
23                                 202-354-3284

24
       Proceedings recorded by stenotype shorthand.
25     Transcript produced by computer-aided transcription.
```

P R O C E E D I N G S

(All participants present via video conference.)

COURTROOM DEPUTY:  Your Honor, we are in Criminal Action 21-116-2, the United States of America versus Verden Nalley.

If I can have the parties identify themselves for the record, starting with the United States.

MS. ROZZONI:  Good afternoon, Your Honor.  Jennifer Rozzoni on behalf of the United States.

THE COURT:  Good afternoon, Ms. Rozzoni.

MR. HAWKER:  Good afternoon, Your Honor.  This is Tom Hawker on behalf of Mr. Nalley.  And with us today is Zelda Peppers, his significant other.

THE COURT:  All right.  Great.  Good afternoon, Mr. Hawker and Mr. Nalley.

Mr. Hawker, as you know, I can proceed with the sentencing by video conference, but I need to make the appropriate finding under the CARES Act that this matter can't be continued further without serious harm to the interests of justice.

So can you articulate for me why we should proceed by video rather than wait until Mr. Nalley can appear in person in court.

MR. HAWKER:  I've spoken with Mr. Nalley at length about his right to appear in person with everyone present, present in court, and he has agreed to appear by video under the CARES Act.

1      Cases are still out there and exist.  Mr. Nalley has chosen

2  not to be vaccinated as a result of -- just personal choice.  So

3  he is at higher risk than others because of the pandemic and the

4  state of affairs to contract it, even though the numbers are on

5  decline.  So we felt it best to appear by video and not have to

6  travel and be in a group setting.

7          THE COURT:  Mr. Nalley, do you understand you have the

8  right to appear before me in person in the courtroom, if you

9  would like, for sentencing?

10          THE DEFENDANT:  Yes, ma'am.

11          THE COURT:  And I understand from what your attorney,

12  Mr. Hawker, says is that your preference is to proceed now, in

13  light of the pandemic, by video conference.  Is that right?

14          THE DEFENDANT:  Yes, ma'am.

15          THE COURT:  All right.  So I do believe it's

16  appropriate to proceed by video conference for sentencing.

17      I have reviewed the final presentence report and the

18  recommendation of the probation officer.

19      And good morning, Ms. Baker.  Sorry I didn't say hello to

20  you.  Thank you for joining.

21          PROBATION OFFICER:  Good morning, Your Honor.

22          THE COURT:  All right.  So I've reviewed her report

23  and her recommendation.  I have also reviewed the parties'

24  sentencing memoranda, the letters submitted on behalf of

25  Mr. Nalley, the video footage provided by the government, as

1   well as the chart of sentences imposed to date that was an

2   exhibit to the government's sentencing memorandum.

3        Mr. Hawker, have you reviewed the presentence report with

4   Mr. Nalley?

5             MR. HAWKER:  Yes, Your Honor.

6             THE COURT:  And Mr. Nalley, have you read the

7   presentence report and had adequate time to talk to your

8   attorney about it?

9             THE DEFENDANT:  Yes, ma'am.

10            THE COURT:  And did you have a chance to correct any

11  errors in the report?

12            THE DEFENDANT:  Yes.

13            THE COURT:  Are you satisfied with his services as

14  your attorney in this case?

15            THE DEFENDANT:  Yes, ma'am.

16            THE COURT:  All right.  In addition to the presentence

17  report, did you also have a chance to review the other

18  sentencing memoranda filed by the government?

19            THE DEFENDANT:  Yes.

20            THE COURT:  And you had time to talk to Mr. Hawker

21  about that as well?

22            THE DEFENDANT:  Yes, ma'am.

23            THE COURT:  All right.  Mr. Hawker, are there any

24  unresolved objections to the -- or factual inaccuracies in the

25  PSR?

1          MR. HAWKER:  No, Your Honor.

2          THE COURT:  All right.  And none for the government?

3          MS. ROZZONI:  No, Your Honor.

4          THE COURT:  All right.  I will accept the presentence

5     report as my findings of fact pursuant to Rule 32 of the Federal

6     Rules of Criminal Procedure.

7          Let me start with the guidelines.  The parties agree that

8     the guideline calculations set forth on pages 9 and 10 of the

9     PSR are accurate for the offense to which Mr. Nalley entered a

10    plea, entering and remaining in a restricted building or ground

11    in violation of Section 1752(a)(1).

12         Is it just (a)(1), or is it two subsections, Ms. Rozzoni?

13         MS. ROZZONI:  It's just (a)(1), Your Honor.

14         THE COURT:  (A)(1), okay.

15    And under the guidelines, which I've independently

16    calculated, I do agree with the Probation Office that the base

17    offense level under Section 2B2.3 is a 4.  A two-level upward

18    adjustment applies because Mr. Nalley was in the U.S. Capitol

19    building, and he's entitled to a two-level downward adjustment

20    for acceptance of responsibility.  That results in a total

21    offense level of 4, and given that his criminal history category

22    is I, his guideline range is zero to six months in prison.

23         Do the parties both agree?  Ms. Rozzoni?

24         MS. ROZZONI:  Yes, Your Honor.

25         THE COURT:  Mr. Hawker?

1              MR. HAWKER:  Yes, Your Honor.

2              THE COURT:  All right.  So, Ms. Rozzoni, I will start

3    with you.  I understand the government is seeking a 14-day

4    sentence with one year of supervised release and 60 hours of

5    community service.

6         Before you get into your allocution, I'm just curious,

7    Ms. Rozzoni, can you tell me, Mr. Nalley's case seems very

8    different than the other defendants I have before me who are

9    charged with the 1512(c)(2) offense.  As far as I can tell, he

10   didn't engage in any assault, any property damage.

11        Can you tell me how the -- I'm just curious where the

12   government is drawing the line in these cases with respect to

13   that offense.

14             MS. ROZZONI:  I will do my best, Your Honor.

15        With regard to the 1512, that is a part of the reason that

16   we did agree to allow Mr. Nalley to plead to the misdemeanor as

17   to 1752(a)(1) as opposed to 1512.

18        He was one of the very early defendants charged in this

19   case, and at the very onset, I believe that the 1512 was charged

20   a bit more -- a bit more, let's put it that way.  And after

21   approximately six to eight months had passed and more people had

22   been charged and more activities and behavior had been looked

23   at, I think there was a group of defendants that the government

24   decided were more appropriately charged with 1752.

25        And so in this case, that is why Mr. Nalley was offered the

1752 and why the government has agreed to dismiss the 1512.

He did have rhetoric online that we have included in the sentencing memo, but the government decided that that -- well, it certainly still would have gone to trial on the 1512 in terms of his intent to obstruct.  It felt that a better resolution of the case was to plead him to the 1752, and I believe that he agreed to that.

THE COURT:  But do you have any evidence at all that he intended to act on those threats?  Presumably, you're talking about the, you know, "we'll be back with guns in two weeks."  Does the government have any evidence that he or Mr. Calhoun was intending to follow through with that?

MS. ROZZONI:  Your Honor, I don't have any other information other than the fact that he posted these on social media.  And one can only look at what he said in terms of, you know, he was there that day, he minimized what happened on January 6th in those postings, and then he said if things didn't get fixed, that they would be back with guns.

Whether we have -- I don't have anything additional to that except to say that --

THE COURT:  When was he arrested?

MS. ROZZONI:  He was arrested, I believe, on February, I want to say, 13 or 14 of 2021, Your Honor.

THE COURT:  So well more than two weeks after January 6?

1          MS. ROZZONI:  Yes.

2          THE COURT:  But no action -- I mean, he didn't, to

3    your knowledge, act on that threat in the two weeks following

4    January 6?

5          MS. ROZZONI:  He did not, Your Honor.  And I can't

6    dispute that, that he did not act on it, but he certainly made

7    those statements, and those statements were very, very

8    concerning and really are the primary aggravating factor here

9    and is a large reason why we are asking for the 14 days.

10          THE COURT:  It's just hard for judges to determine

11    whether these are just rants that we've heard from a lot of

12    defendants, that they like to stir people up on the Internet,

13    and, you know -- he's not charged with any sort of threat.

14      So it's really hard to know what to make of that, if all

15    you're telling me is that he posted that one statement.  I

16    don't --

17          MS. ROZZONI:  I'm sorry.  I didn't mean to interrupt

18    you.

19          THE COURT:  No, go ahead.

20          MS. ROZZONI:  The fact that he was there on January 6

21    is something, too.  It's not that this was --

22          THE COURT:  No, no, obviously, obviously.  But you're

23    drawing lines for these defendants.  I take it he's pleading to

24    a class A misdemeanor rather than a class B because he posted

25    that statement.

1          MS. ROZZONI:  Yes, that is a part of the reason.  He

2    was originally charged with a 1512.  The government felt like it

3    had that charge and could prove that charge at trial.

4    Otherwise, it wouldn't have, obviously, charged it in the first

5    place.

6          But after, again, looking at all -- a larger number, since

7    he was one of the first people, obviously, charged, looking at

8    behavior across the board, the government came back and decided

9    that this plea was probably the more appropriate plea in his

10   particular case.

11         And I will note, Your Honor, that we still are going

12   forward on the 1512 of Mr. Calhoun, because there is a lot more

13   information related to his behavior both before and after.

14         THE COURT:  Beyond statements?

15         MS. ROZZONI:  Beyond statements?  No, actually not

16   beyond statements, but the government does believe that those

17   statements indicate a willingness and an --

18         THE COURT:  Perhaps, perhaps.  I mean, a jury will

19   decide.  But it's -- you heard his testimony in the detention

20   hearing.  I think these are hard cases.

21         MS. ROZZONI:  I will not stand before you and tell you

22   they are not, but it doesn't mean that they are cases that

23   shouldn't be brought.

24         THE COURT:  Okay.  Well, I assume you're familiar with

25   the jury instructions I gave in that case.  You're going to need

1    to show an unlawful means or an unlawful purpose.

2              MS. ROZZONI:  I am, Your Honor.

3              THE COURT:  All right.  Well, let's move on to this

4    defendant.

5         So I have yet to sentence, Ms. Rozzoni, a defendant in a

6    January 6 case, even the lowest -- the least culpable

7    defendants, to less than two years' probation.  You're asking

8    that I impose a 14-day sentence, which would be 11 days because

9    he would get credit for the three he's served already.  So

10   you're seeking an 11-day sentence and his only being under the

11   Court's supervision for just a year.

12        You've probably heard, I don't buy the government's

13   argument that I can impose both prison time and probation.  I

14   think it's either/or.

15        So I think in cases like Mr. Nalley's, I have been imposing

16   two or three years' probation, because I do think if -- if the

17   concerns are there, there's a need for more supervision.

18        So just help me understand why the government's pressing

19   that sentence, given that it limits the Court to one year of

20   supervision.

21             MS. ROZZONI:  I understand, Your Honor, and I will

22   absolutely answer your question in a moment.  I just wanted to

23   add one additional case, a 1752(a)(1) case to our list of cases

24   so that you could consider that as a part of your decision.

25        Yesterday, Judge Sullivan sentenced James Bonet to 90 days'

imprisonment, Your Honor, and one year of supervised release and 200 hours of community service.  Mr. Bonet also had originally been charged with 1512(c).  That was actually dropped, and he pled to the 1752(a)(1).

In Mr. Bonet's case, he was in the Capitol for, I believe it was, 17 to 18 minutes, but his aggravating factor was that he ended up, I believe, in a senator's office smoking marijuana. And so that was what was emphasized by the government in that case, and I do believe it is what impacted Judge Sullivan in his actually doubling what the government was requesting.

THE COURT:  Okay.  Well, the cases that you cite to support your argument that a sentence of imprisonment is appropriate are really not analogous to this case.  Courtright, the defendant temporarily seized government property and attempted to break into locked doors.  Ridge said he had broken down doors and sent electronic messages ahead of time stating his intent to block the proceedings.  Tryon resisted law enforcement, that he was pepper sprayed and hit with a baton, that he intended to disrupt Congress.  Schornak engaged in combative behavior, I assume with law enforcement, arrived in D.C. with tactical gear and a bull horn.  Johnson tried to get into the Speaker's office, overwhelmed a line of police, destroyed evidence.  Howell prepared and planned with others before the attack, acquired tear gas, destroyed evidence.

So I don't really view this case -- the one aggravating

1   factor that might distinguish this case from some of these other

2   cases where I've sentenced defendants to two or three years'

3   probation is this line you have in your brief about him pushing

4   through a police line.  But I've watched your video.  That's not

5   reflected in that.  I've looked at the photographs.  It's not

6   apparent.

7       What is that exactly?

8       MS. ROZZONI:  Your Honor, what that relates to is the

9   first image in the sentencing memo where Mr. Calhoun and

10  Mr. Nalley are coming up the -- I believe it's the stairs

11  underneath the scaffolding.  He enters through, as you know, the

12  Senate doors.  And so there was a police line there at the top

13  of the stairs before it flattens out and you go into the Senate

14  doors.  There was a police line there at the top of the stairs

15  where the scaffolding was.

16      THE COURT:  So did he touch an officer?

17      MS. ROZZONI:  We don't have any evidence that he

18  touched an officer, Your Honor.

19      THE COURT:  So where was the police line standing?

20  How did he get through it without touching someone?

21      MS. ROZZONI:  So the police line was at the top of the

22  stairs where the scaffolding was, and he was not in the very,

23  very first group of people who pushed through, but there was a

24  large police presence there.  And so he --

25      THE COURT:  Well, I've watched the video of the west

1    side at length during this trial, and I saw the initial push.

2    But he came six minutes later.  So weren't those officers

3    standing to the side by that point?

4         MS. ROZZONI:  Your Honor, I would submit that he was

5    the beneficiary of having and continued -- that entire crowd was

6    a continuous group of people who walked through that line.  That

7    line couldn't have come back together.

8         But I understand what you're saying; I do understand what

9    you're saying.

10        THE COURT:  But how is that any different than anyone

11   else who broke through six minutes after others did?  It's -- I

12   don't think that the broken line is -- I don't think it's fair

13   to characterize that as pushing through a police line that's

14   been broken six minutes earlier.

15        MS. ROZZONI:  Well, the police line was unable to come

16   back together because this large group of people continued to

17   flow through that area.  So it would be the government's

18   position that had he not been -- the police line would have come

19   back together had there not been this continuous flow of people.

20        THE COURT:  But that's not pushing through a police

21   line.  That's preventing a police line from reforming.

22        MS. ROZZONI:  That is -- I would agree with your

23   statement, Your Honor, but the police could not come back

24   together because there was this continuous flow of people that

25   continued into the Capitol.

1          THE COURT:  All right.  Is it true there's no evidence

2    he prepared ahead of time for this?

3          MS. ROZZONI:  I don't have any evidence of that, Your

4    Honor, but certainly, he prepared -- he agreed to go with his

5    friend.  Obviously, they had to travel to D.C. on January 5.

6          THE COURT:  But do you have any evidence that he went

7    to D.C. intending to go in the Capitol?

8          MS. ROZZONI:  No.  I mean -- no, there's nothing that

9    says that.

10         THE COURT:  And no evidence he was armed?

11         MS. ROZZONI:  No.

12         THE COURT:  No assault or confrontation with any law

13   enforcement officer outside or inside the Capitol?

14         MS. ROZZONI:  Not that we're aware of, Your Honor,

15   although I will say that he was in the crypt.  There was a

16   police line -- and I apologize.  I was thinking of the

17   scaffolding because I originally -- that was his original entry.

18   But he also was in the crypt area where there was a police line,

19   and that police line was actually broken through as he was

20   there.  And there's a photograph, I believe, the image of him

21   facing the camera.  There's no circle on it.  But that's just

22   after that police line was broken.

23       So just to be clear, I don't have any evidence that he

24   pushed or touched any officers, but he certainly was in the

25   crypt area when that police line fell.

1        THE COURT:  Okay.  No property damage by him?

2        MS. ROZZONI:  Not that we're aware of.

3        THE COURT:  Didn't go in any private offices?

4        MS. ROZZONI:  Not that we're aware of, Your Honor.

5        THE COURT:  After his initial comments not accepting

6   responsibility, he then accepted responsibility and cooperated

7   with law enforcement?

8        MS. ROZZONI:  He did, Your Honor, and I will say, he's

9   remained compliant with his conditions.

10        THE COURT:  And is he prepared to testify against

11   Calhoun?

12        MS. ROZZONI:  We have not engaged in those

13   discussions, Your Honor.

14        THE COURT:  All right.  Okay.  Go ahead.  I've maybe

15   taken the wind out of your sails, but --

16        MS. ROZZONI:  You haven't taken the wind out of my

17   sails, Your Honor, although I will say that -- let me just start

18   by saying, we did submit Exhibit B in response to your filing on

19   Tuesday.  I actually hadn't submitted any video, but just so

20   that you could see his initial entry into the Capitol building

21   there at the Senate doors.

22        THE COURT:  Yes.

23        MS. ROZZONI:  And so I would ask that that be made a

24   part of the record.

25        THE COURT:  And is that something, I take it, that

1    you've uploaded so the public can see it as well?

2              MS. ROZZONI:  I will be, Your Honor, as long as -- I

3    just wanted to make sure it was a part of the record.

4              THE COURT:  It is.  All right.  Thank you.

5              MS. ROZZONI:  And then, of course, Your Honor, I would

6    just say that -- and I know that you have dealt with these

7    cases, and I know that you just have finished a trial where you

8    are now intimately involved or aware of, you know, what happened

9    on January 6 and the position of the government.

10         But to say that January 6 was unprecedented would really

11   not do any justice to what happened that day.  Thousands of

12   people were brought to D.C. with a lie of a stolen election.

13   They marched on the Capitol.  They pushed over barricades.  We

14   see Mr. Nalley walking up those steps with that large group of

15   people.  He wasn't one of them, but numerous people attacked and

16   assaulted police officers.  Certainly, Mr. Nalley was not -- was

17   witness to at least some of that.  And then they breached the

18   Capitol building.

19         It wasn't just an attack on the Capitol, Your Honor, or the

20   people protecting it.  It was actually an attack on democracy

21   and the rule of law itself.

22         You know that the nature and circumstances of this offense

23   are important for you to consider, and that is why the

24   government is seeking the 14-day sentence here.  Certainly, the

25   primary aggravating factor that the government sees are the

post-January 6 postings about bringing guns back to the Capitol in two weeks, and we would continue to ask for 14 days, given those -- the fact that he was there, what he did, he was in the Capitol for 40 minutes, and then he made those statements after the fact.

I do acknowledge and understand that, you know, you certainly need to take into account Mr. Nalley's history and characteristics, and I know that his history does not exhibit any violent tendencies.  But frankly, Your Honor, threatening to bring guns back to the Capitol do indicate some violence or at least a thought about violence and what he would do in the future if things weren't, quote, fixed with --

THE COURT:  Is that, in your view, Ms. Rozzoni, a criminal act that you can charge?

MS. ROZZONI:  It was not -- I'll just say, I haven't done the research, and it was not considered as a part of this case.  I would --

THE COURT:  But that is a key reason why you have charged him the way you have and why he's pleaded guilty to the offense he has.  So I'm just curious.  If that's not a criminal offense -- just this line, how do you know when folks are just doing this to spout off versus really intending to act on these outrageous things?

I'm not condoning, by any stretch, these statements. However, we all have First Amendment rights, and I'm curious

1    whether you know whether that could be charged.

2          MS. ROZZONI:  Your Honor, I don't know the answer to

3    that, because I haven't done the research to ensure that

4    obviously that line would not be crossed.  But I can tell you,

5    those posts, in conjunction with the fact that he had been there

6    on January 6 and the fact that he was minimizing what happened

7    that day, they're highly concerning.

8          So that charge has not been charged here, but certainly,

9    you are right, the reason he is pleading here is because it's

10   all part and parcel of something bigger.

11         So where that line is, Your Honor, we are -- we have

12   created that line in every case where we've charged people with

13   varying statutory violations, and in this case, we went with the

14   1752, and we think that that's the appropriate charge.  And

15   obviously, Mr. Nalley felt it was the appropriate charge because

16   he pled guilty to it.

17         And then you can take into account all of the other

18   behaviors as a part of your sentence.  And our biggest concern

19   here are those posts, understanding he absolutely has a First

20   Amendment right to his points of view, to his opinions.  But you

21   also -- you know, he comes dangerously close, if not over, the

22   line when you start talking about bringing guns back to the

23   Capitol because you believe that an election has been stolen.

24         THE COURT:  Understood.  So, you know, the other thing

25   I have to be careful of is trying to treat similarly situated

defendants similarly.  And in my view, looking at the cases that I've sentenced, I view his case as less egregious than Dillon, who I sentenced to three years' probation and two months' home detention.  She came prepared to attack the Capitol and physically engage with law enforcement on the very front line as the violent mob reached the Capitol.  She was on, I think, the east side, but right in that first push, not six minutes later.

I'm also viewing it as less egregious than Kostolsky, who did not fully cooperate with law enforcement initially and deleted evidence, and Walden, who came prepared for the event with gear, I believe a gas mask.

I think the facts here are closer to McAlanis, Williams, Schwemmer, Harrison, and Wangler.  But unlike all those defendants, Mr. Nalley did serve a few days in prison already, and therefore, I'm, you know, having a hard time distinguishing the sentences I imposed in those cases from what might be appropriate here.

So to the extent you have any thoughts on those cases, Ms. Rozzoni, and how his case is distinctive, aside from the remark, which again I'm not -- I think it shows incredible lack of judgment for him to post such an offensive statement, particularly after he breached the Capitol just days before.

But I don't know that absent some evidence that he intended to act on it in any way, that that alone justifies a dramatically different sentence than the other defendants I've

1  sentenced already.

2          MS. ROZZONI:  And I understand that, Your Honor.  I

3  will say that in some of the cases that you're citing, the

4  government did recommend more.

5          THE COURT:  No, I know; I know.  But I'm supposed to

6  be consistent with what I've done, not what you recommend.

7          MS. ROZZONI:  And similarly, I think we are trying to

8  be consistent across the board in terms of what we recommend and

9  the way we see the facts and how they shake out.  So I

10  appreciate your position on that.

11          THE COURT:  Okay.

12          MS. ROZZONI:  So I guess that's where we would come

13  down --

14          THE COURT:  All right.

15          MS. ROZZONI:  -- is that we're trying to be as

16  consistent as possible based upon what we see and the --

17          THE COURT:  Understood.  Okay.  Mister -- oh, one more

18  question, Ms. Rozzoni.  Anything else beyond community service

19  that you think would be appropriate conditions of supervision?

20          MS. ROZZONI:  No, Your Honor.  Again, trying to be

21  consistent across the board, we are recommending 60 hours, which

22  I think is our standard recommendation in cases such as this.

23          THE COURT:  All right.  Mr. Hawker?

24          MR. HAWKER:  Yes, ma'am.  You've covered a lot of what

25  I was going to say.  So I will just cut to the chase.

1          THE COURT:  Sorry.  These sentencings get shorter and

2     shorter as we roll down different buckets of defendants.

3          MR. HAWKER:  It helps to have that.  So I won't go

4     into the lack of X, Y, Z in terms of violence and threats at the

5     event.  I think you get it.

6          And his post-event, two days later, political rant is just

7     that.  I think he posted it on Facebook or Parlor, and it got

8     reposted to MeWe and then somewhere else, and that's, I think,

9     what's cited.  And those things kind of reverberate, but that's

10    all a part of sort of what was happening at the time, is that

11    people were repeating things other people said.  In fact, I

12    think it was cited it was on MeWe, which he didn't put it there,

13    and then reposted somewhere else.

14         But in any event, this was an echo chamber for the most

15    part.  And he was a part of it, and it was very bad judgment,

16    and he had no intention of acting on any of that.  He got caught

17    up.  And that was two days on the heels of it and very ill

18    advised, very poor judgment, regretful, but it doesn't change

19    the fact about what he did there.

20         And I get why the government sees that as a distinguishing

21    feature, because they don't know whether he's going to act on it

22    or not, and he wasn't.  And the context of it was after the fact

23    in his house, everybody just bouncing the echo chamber, and

24    that's basically what that was.

25         THE COURT:  Has he learned his lesson, Mr. Hawker?

1          MR. HAWKER:  Oh, my goodness, in so many ways, I would

2     say so.  He and I have been together here in these conference

3     rooms for some time now after the event.  And it's been tough.

4     I think that the process -- I don't want to say -- sometimes the

5     process is the punishment.  I know that's not necessarily always

6     the case.  This has sort of impacted him in that way because of

7     what's happened, the publicity, kind of the -- he did not want

8     that for himself, even though he posted stuff.

9          In addition, he's been on bond for a year and has had to be

10    in pretty tight quarters for three months before he was just on

11    curfew and has had to pay for a leg monitor for a year.  So the

12    consequences of this have been felt by him for more than a year

13    now, both financially as well as being confined to his home for

14    three months because he wasn't able to find work.

15         And Judge Weigle here was pretty strict in his conditions

16    when we had the bond motion.  He said you're not leaving,

17    period, unless you can do an advanced schedule to your probation

18    officer, Mr. Cochran here, and approve it in advance unless it's

19    medical or otherwise.

20         So he basically was confined for three months to his house.

21    That hit home pretty hard.  And I know that it's prevented him,

22    you know, from kind of going out and searching and doing the

23    work that he wanted to do in other states.  I know he had some

24    opportunities in South Carolina.  And so his bill payment has

25    been impacted, not to mention the worry over the year of what's

going to happen being charged with a felony, never having had

one, only one mark when he was 18 for a nolo misdemeanor,

misdemeanor marijuana.  He's not a person who is accustomed to

the criminal justice system or contact with it.  He certainly

found out by going up there that day, and he knows that.

But the consequences have been real.  They've been

restriction on his freedom.  They've been home confinement for

three months.  They've been three nights in a jail cell.  He got

arrested -- he went to meet the agents at the gas station on the

16th in the evening, Judge, and they took him into custody, of

February, which, you're right, was two weeks later, and then he

was -- they spoke with him the first time on the 1st of

February.  They followed him there, and they interviewed him,

and he was cooperative.  He showed them his phone and told them

why he was there and admitted he was in the Capitol.  From the

jump he was pretty candid with them.

And then he went back on the 16th, was arrested that

evening, and spent the night in Gwinnett County Jail and then

that morning got brought over to the Marshals Service, the 17th

taken down to Lovejoy, which is Robert A. Deyton Detention

Center, and spent the 17th and 18th there before he was released

on the 19th.

So he has been in jail and been in home confinement for

three months effectively.  It may not have been the intention,

but that's what it resulted in.  It was the result of his bond

conditions and is having an impact financially, I think, of --
there's the pandemic, obviously, and it might have happened
otherwise.  But it's been tough.

He's also had some difficulty, as I mentioned, at the
airport, which I don't believe was random screening.  So that's
been tough for both of them, and it's a reminder of what
happened, and it certainly is a deterrent moving forward.

I think the prosecutions themselves are a deterrent in
these cases, which is why the government is doing what they are
doing, which is identifying people, including those who just
went in and came out without touching a police line or a police
officer, not doing any damage to property, not going to
chambers, to prosecute them, because that is the deterrent, for
the most part, in these cases.

And so is, I think, the supervision, which is a very real
consequence, and that will move forward with whether it's -- if
there's more confinement, that's a consequence, but I believe
just supervision would be appropriate, whether it's one year
following the jail time he's done or even two years of
probation, because it does restrict freedoms.  It does.
Reporting to the probation officer periodically, reporting
contact with law enforcement, giving up your right not to be
searched and your person and property under standard conditions,
random drug tests, travel restrictions, work requirements.  It's
very real, the consequences to these folks on supervision, on

1    bond as well as post-offense.

2        So the consequences of this for him -- and I've seen the

3    disappointment and fear and anxiety and remorse -- will

4    reverberate for him probably one, two, three years into --

5    post-event, which is significant for someone especially like

6    Mr. Nalley who -- he's a very -- he's a simple guy, and I don't

7    say that pejoratively.  He's a guy who he got caught up in it

8    with his band mate, Mr. Calhoun.

9        His real passion is playing music in bars and barns here in

10   Georgia.  He's a construction worker, contractor, and he's in a

11   great relationship with Ms. Peppers for seven years, lives with

12   her.  She houses veterans and has three currently there with her

13   who are in transition, whether it's medically from the VA or

14   it's from military service to civilian life.  She has three of

15   them there that she's giving housing to now, and she works as a

16   home health aide.  But he lives with her there.  They have a

17   great life together there.

18       And I do believe it's impacted him, and I do believe he's

19   felt the impact of it, will, and he's remorseful, Judge.  I

20   believe he's learned his lesson.  The only time he went to D.C.

21   in his life was this.

22           THE COURT:  How did someone like Mr. Nalley, who has

23   lived this clean record his whole life, get caught up in

24   something like this?

25           MR. HAWKER:  Well, I will tell you, it's -- my

personal opinion is I think it's largely a factor of who you're hanging out with, what you're listening to, and what the media is telling you, and I think it was a combination of all those things.

I think that -- I think probably Mr. Calhoun has strong opinions.  He's a lawyer.  He's kind of an individual that Vernon looked up to, I think, to some degree.  He probably shared some political opinions with him, probably talked about things.  And I'm not blaming him in any way.  I'm just -- it kind of reinforces maybe some tendencies he may have had and some of his own political beliefs about the then administration prior to the change of administration.  And the media, I think.

Of course, it's his own free will to make the decision to go up there for the speeches.  And he did not plan on going to the Capitol.  He did follow people from the speeches down and then went in.  He didn't hesitate, it doesn't look like, but he went in and got caught up in it.

So it was kind of one of those swept-away moments for him, having never been up there.  I don't know that he's overtly political necessarily, but he had strong views based on the moment in time, folks he was with, the media reports of it, the exhortations of the speeches and the whipped-up frenzy that that caused.  And then this sort of grew, I think, with a lot of folks who were just kind of a part of the herd that followed folks down there.

1          THE COURT:  Thinking they'd never get arrested because

2    there's so many?

3          MR. HAWKER:  I guarantee that's the case.  I would

4    imagine that is absolutely the case, that well, others are doing

5    it, and it's the Capitol building, and we're going in, and the

6    doors were open at the time, even though it was clearly not an

7    authorized entry, that we won't get prosecuted, and I'm not

8    doing any harm, so I'm just here, right, it's not something that

9    I'm consciously thinking I did this necessarily, it's I'm with

10   others who did it but I'm going to go in.  And he was taking

11   pictures.  He had never been in there, actually, before and

12   probably was curious.

13       And then afterwards, he was sort of a part of the group,

14   echo chamber, as I call it, that sort of reinforced their

15   beliefs about the cause, so to speak.

16         THE COURT:  And the cause being the stolen election?

17   Is that the cause?

18         MR. HAWKER:  I would think so, right.  And of course,

19   that's what was being touted politically, publicly by officials

20   who were elected and with the support of the administration.

21       And some people are more prone to believe that because it's

22   said by folks who are elected, it's supported by others who are

23   elected, and broadcast on national media, and he's one of them,

24   frankly.  And there are lots of them, and many of them were up

25   there.  It may have been the reason they went to the speeches.

And I don't think for him it was the reason -- he didn't prepare for going into the Capitol.  He didn't bring stuff to go into the Capitol.  He wasn't waving a flag or a banner.  He didn't have a bull horn.  He didn't have a cape on with a "Q" on it.  There's none of that here.  We don't have sort of the incidents of I'm with some sort of preplanned, premeditated group insurrection going to the Capitol to stir up trouble.  He was there and participated and joined sort of the tidal wave that went in.

And that's all I can do really to explain why someone like him would get caught up in it and move forward.  But he does regret it.  I know that for a fact.  And he's hopeful that whenever it's over it will actually be over for him, that he won't be subjected to random searches when he flies for the rest of his life.  And that's, hopefully, not going to be the case. I think that he will successfully complete any supervision that he's given with the help of Ms. Peppers.

He's just had no contact with law enforcement, and that's why I think the guidelines in zone A and the Commission's commentary from 18 where they said, you know, if you're in the A or B and you're really effectively a nonviolent first offender -- and his conduct was nonviolent.  I know the event was.  I don't think it's splitting too fine a line to say he's a nonviolent first offender.

Even in zone B where it's ten to 18 months, they recommend

consideration of a noncustodial sentence in the commentary to

the 5(c) application note 4, and that's zone B where it's ten to

18 months.  He's not even at the high end of zone A, which is 1

to 8 offense level.  He's at offence level 4.  The guidelines

and the commentary from the Sentencing Commission would suggest

that -- a noncustodial sentence as a guideline sentence here.

And because I see it as there's not a sufficient

aggravating factor to take it out of that context, I would agree

that additional time is not necessary.  He's even done time

here.  So not only does he have jail time, but he will have

supervision of whatever form, whether it's supervision or

probation, restitution.

Community service of 60 hours we're fully on board with or

however many the Court wants to impose.  He will complete them.

And he'll do it fine.  And then -- and he probably even has a

mechanism to leverage into some community service with a

veterans group, because of Ms. Peppers and her work.

So there are ways for him to serve and make amends in some

way for this.  Plus, he will also, you know, be subject to the

conditions of reporting and whatnot.

THE COURT:  Well, it sounds like absent this really

offensive remark posted online two days after the event, that

Mr. Nalley would have been in a different bucket from the

outset.  And so I hope that, as you say, he's learned his

lesson, and he's going to be more independent and not influenced

by others moving forward, particularly even online, because

that's -- you know, creates a threat that the government

naturally needs to run to the ground and assume the worst.

MR. HAWKER:  It does, Judge, and social media is no

longer for Mr. Nalley.  I don't believe -- and of course, my

recommendation, I'm sort of anti social media personally.

THE COURT:  Me too.

MR. HAWKER:  I don't have a Facebook account, although

I'm told by the experts that yes, you do, you just don't know

it, that Facebook has you down as not having an account as a

placeholder.  But he doesn't have any more social media

accounts, not active anyway.  He certainly doesn't participate

in them.  You can go online and participate ad hoc in a chat or

whatever, and you do have to be very, very careful because the

government doesn't know and they have to investigate and run it

to the ground.  I agree 100 percent.  It's tough to make those

judgment calls.

THE COURT:  Yeah, agreed.

All right.  Mr. Nalley -- well, anything you would like to

say in response, Ms. Rozzoni, before I give Mr. Nalley a chance

to speak?

MS. ROZZONI:  No, Your Honor.

THE COURT:  So, Mr. Nalley, you have the right to make

a statement if you would like to do so.  You don't have to.  But

is there anything you would like to say to me before I give my

1    reasons for the sentence that I will impose?

2            THE DEFENDANT:  I made a huge mistake, Your Honor, and

3    I'm sorry to my family and the courts and you and the justice

4    system.  I made a mistake.  I just want to move on.

5            THE COURT:  I can understand that.  It does sound like

6    you're -- while you weren't remorseful immediately, you became

7    remorseful soon after the immediate aftermath of January 6; is

8    that a fair statement?

9            THE DEFENDANT:  Yes, ma'am.

10           THE COURT:  All right.  Okay.  Is there any reason why

11   sentence shouldn't be imposed at this time?  Ms. Rozzoni?

12           MS. ROZZONI:  No, Your Honor.

13           THE COURT:  Mr. Hawker?

14           MR. HAWKER:  No, Your Honor.

15           THE COURT:  All right.  So I'm required to consider

16   not just the guidelines, but the various factors outlined in

17   Title 18 United States Code Section 3553(a).  I'm familiar with

18   those factors, and I've considered them all here even if I don't

19   mention each one.

20       Although the charge to which Mr. Nalley has pled guilty is

21   a misdemeanor, a class A misdemeanor, his conduct on January 6

22   was very serious.  I agree with Ms. Rozzoni that he was a

23   willing participant in a riot that undermined our democratic

24   electoral process and threatened the rule of law.

25       I can understand that he's been permitted to plead guilty

to a misdemeanor because, as we've discussed already, there is no evidence that Mr. Nalley engaged in any preplanning before the event.  It does seem that he was swept up in the events of that day.  He did not come to Washington with gear or with firearms.  He did not -- when he entered the Capitol, he did not assault any police officers, injure any officers, damage any property.

But certainly, his mere presence alone did subject the Capitol police officers to greater risk that day as they heroically tried to defend the Capitol and protect members of Congress.

I do credit Mr. Nalley's acceptance of responsibility. Though he was a bit slower to express his remorse than he should have been -- as I said, he made some terribly offensive remarks online which did show, at a very minimum, a tremendous lack of judgment, given what he had done just two days later -- I do believe he now recognizes the seriousness of his conduct, and he is on a different path.

He's been gainfully employed throughout his life.  This really is an unusual event in his otherwise, you know, law-abiding record.  He did have a marijuana conviction for which he was sentenced to probation at the age of 18, but since then, he's had no other convictions.

This misdemeanor offense has a maximum term of imprisonment of 12 months, a guideline range of zero to six months, and up to

1    five years' probation, a maximum fine of $5,000 -- no, that's

2    not right.  What's the maximum fine here, Ms. Rozzoni?  Anyway,

3    I think the guideline range for the fine, I believe, is $500 to

4    $9,500.  He's eligible for a one-year term of supervised release

5    if sentenced to imprisonment and subject to a special assessment

6    as well.

7        Given Mr. Nalley's resources that are set forth in the PSR

8    and his liabilities, I do not find that he has the ability to

9    pay a fine in this case, but consistent with the plea agreement,

10   I will impose restitution in the amount of $500 to defray some

11   of the costs associated with the damage to the Capitol on

12   January 6.

13       As I've mentioned, I've considered similar cases in

14   determining the appropriate sentence, and consistent with the

15   sentences imposed in those cases, I believe a sentence of two

16   years' probation coupled with 60 hours of community service and

17   a $500 restitution payment is sufficient but not greater than

18   necessary to address the goals of sentencing.  I believe it will

19   protect the community and fulfill deterrence goals, both

20   specific and general, as well as punish Mr. Nalley.  I don't

21   believe a sentence of imprisonment is necessary to provide

22   specific deterrence or respect for the law or rehabilitation.

23       So I will now formally read the sentence and give both

24   parties a chance to object before I actually impose the

25   sentence.

1      Pursuant to the Sentencing Reform Act of 1984 and in

2  consideration of the provisions of Title 18 United States Code

3  Section 3553, it is the judgment of the Court that you, Vernon

4  Nalley, are hereby sentenced to a term of two years' probation

5  on Count 4.  In addition, you are ordered to pay a special

6  assessment of $10.

7      While on supervision, you shall abide by the mandatory

8  conditions as well as the standard conditions of supervision.

9  The mandatory conditions include not committing another federal,

10  state, or local crime; not unlawfully possessing a controlled

11  substance; refraining from any unlawful use of a controlled

12  substance; submitting to a drug test within 15 days of placement

13  on supervision and at least two periodic drug tests thereafter

14  as determined by the probation officer.

15      You must make restitution.  You may make those payments to

16  the Architect of the Capitol in the amount of $500.

17      I will allow, for this case, the supervision to be

18  transferred to the U.S. District Court for the Northern District

19  of Georgia, but I will retain jurisdiction of the case.

20      In addition, you shall comply with the following special

21  conditions:  Complete 60 hours of community service within six

22  months.  The probation officer will supervise your

23  participation.  As I said, I don't find that you have the

24  ability to pay a fine.  Therefore, I waive imposition of a fine

25  in this case.  The financial obligations are immediately payable

1   to the Clerk of Court for the U.S. District Court.

2        Pursuant -- you do have, Mr. Nalley, the right to appeal

3   the sentence imposed by the Court to the extent you have not

4   validly waived that right to appeal.  If you choose to appeal,

5   you must file any appeal within 14 days after the Court enters

6   judgment.

7        Are there any objections to the sentence I've announced,

8   Ms. Rozzoni?

9             MS. ROZZONI:  No, Your Honor.

10        To be clear for the record, the maximum potential fine was

11   $100,000, although I know you did not impose one here.

12             THE COURT:  All right.  Thank you.

13        And Mr. Hawker, any objection to the sentence imposed?

14             MR. HAWKER:  No, Your Honor.

15        I do want to make sure that I understand.  I think you

16   might have mentioned as you were imposing sentence -- I think

17   it's Count 1 of the information; right?

18             THE COURT:  Oh, what did I say?

19             MR. HAWKER:  I think you said Count 4.  Was that the

20   old indictment?  I'm not sure.

21             THE COURT:  I'm reading the script that I got from

22   Probation.  So that's an error.

23        So this is Count 1 of the information; is that right,

24   Ms. Rozzoni?

25             MS. ROZZONI:  That is right, Your Honor.  Thank you.

1          MR. HAWKER:  I thought I heard it wrong, but otherwise

2     no objection.

3          THE COURT:  Thank you for flagging that.  That was an

4     error.  Beyond that, Mr. Hawker, any other objections?

5          MR. HAWKER:  No, Your Honor.

6          THE COURT:  Okay.  Ms. Baker, anything from Probation?

7          PROBATION OFFICER:  Your Honor, you may have said this

8     and I just didn't hear it.  The $25 special assessment?

9          THE COURT:  Oh, again, this said $10, but again, I'm

10    reading, I guess, from a script that you used in another case.

11    So it's a $25 special assessment; is that what you're saying,

12    Ms. Baker?

13         PROBATION OFFICER:  Yes, it is.

14         THE COURT:  I guess you used a script from a petty

15    offense.

16         PROBATION OFFICER:  Oh, yes, I see exactly what you're

17    saying, in that first paragraph, the Count 4 and the $10.  It

18    should actually be $25.

19         THE COURT:  All right.  With those two corrections,

20    it's Count 1 of the information and $25 for the special

21    assessment, anything else, Ms. Baker?

22         PROBATION OFFICER:  No, Your Honor.

23         THE COURT:  Okay.  All right.  Mr. Nalley, I wish you

24    all the best and hope not to see you.

25         COURTROOM DEPUTY:  Your Honor, excuse me for

1    interrupting.  We don't --

2            THE COURT:  Is there a motion to dismiss the

3    indictment?

4            MS. ROZZONI:  Yes, Your Honor.  Pursuant to the plea

5    agreement, the United States would move to dismiss the

6    indictment as to Mr. Nalley only.

7            THE COURT:  All right.  That motion is granted.

8            COURTROOM DEPUTY:  Thank you, Your Honor.

9            THE COURT:  All right.  Mr. Nalley, so I'm not going

10   to see you back; right?

11           THE DEFENDANT:  No, ma'am.

12           THE COURT:  All right.  I wish you the best.

13       (Proceedings adjourned at 1:28 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1        CERTIFICATE OF OFFICIAL COURT REPORTER

2

3        I, Sara A. Wick, certify that the foregoing is a

4   correct transcript from the record of proceedings in the

5   above-entitled matter.

6

7        Please Note:  This hearing occurred during the

8   COVID-19 pandemic and is, therefore, subject to the

9   technological limitations of court reporting remotely.

10

11

12   /s/ Sara A. Wick                April 15, 2022

13   SIGNATURE OF COURT REPORTER            DATE

14

15

16

17

18

19

20

21

22

23

24

25