**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-116 (DLF)** |
| **WILLIAM MCCALL CALHOUN, JR.,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence William McCall Calhoun, Jr. to 34 months of imprisonment and 36 months of supervised release, and that Calhoun be ordered to pay $2,000 in restitution and $170 in special assessments, consisting of the mandatory assessments of $100 for his felony conviction (Count One), $25 for each Class A misdemeanor conviction (Counts Two and Three), and $10 for each Class B misdemeanor conviction (Counts Four and Five). The requested 34-month prison sentence represents the midpoint of the government's Sentencing Guidelines' calculation for Calhoun, which is 30-37 months of imprisonment.

## I.    INTRODUCTION

The defendant, William McCall Calhoun, Jr., participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9

1

million dollars in losses.[1]

Calhoun, a practicing criminal defense attorney[2] in Georgia, traveled to Washington, D.C. for January 6th to prevent Congress from certifying the results of the 2020 Presidential Election. Social media posts indicate that, before the election, Calhoun anticipated arming himself and travelling to Washington, D.C. to protest. After the election, and before the riot, he wrote online about murdering his political opposition and storming the Capitol, with the stated goal of stopping the certification.

The evidence of Calhoun's intent and premeditation separates him from many other January 6th rioters. This difference is reflected in Calhoun's conviction for violating 18 U.S.C. § 1512(c)(2) and in his advisory Guidelines range of 30-37 months of imprisonment, which the government submits is the correct Guidelines calculation. The government's recommended sentence of 34 months reflects the gravity of Calhoun's conduct, his consistent and continued

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

[2] Given Calhoun's felony conviction in this matter, the State Bar of Georgia moved to suspend his law license pending disbarment. Calhoun requested a disciplinary hearing to contest the suspension, which was conducted on June 21, 2023. Exhibit C (Reporter's Transcript, In the Matter of W. McCall Calhoun, Jr., State Bar No. 103915, State Disciplinary Board No. 7596, dated June 21, 2023). At that hearing, the Special Master found the State Bar met its burden to establish Calhoun's felony conviction, and thus she would issue a report recommending that Calhoun's license be suspending pending the disbarment proceedings. *Id.*

failure to accept responsibility, and his obstruction of justice through false testimony.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

Through its adjudication of its January 6th cases, this Court is well aware of the details of the January 6, 2021 attack on the United States Capitol by hundreds of rioters in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. *See* Affidavit in Support of Complaint, ECF No. 1-1, at ¶¶ 4-5 (brief background on January 6th). Thus, the government will not belabor those facts here.

Notably, the D.C. Circuit observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC),

Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

**B.    Calhoun's Role in the January 6, 2021 Attack on the Capitol**

*Planning for January 6th*

Even before the November 2020 presidential election, Calhoun contemplated rioting if the former President lost. On October 20, 2020, about two weeks before the election, Calhoun posted to Facebook: "Patriots be ready to storm Washington! If you're willing to go to Washington in November to 'peacefully protest' with AR15 in hand, upvote this." Ex. 400. On November 4, 2020—the day of the presidential election—Calhoun posted, in part: "We have a communist revolution happening before our very eyes to steal this election - it's obvious. Americans get ready to rise up and kill the democrat communists before they do it to us." Ex. 402. Calhoun's violent rhetoric surrounding the election continued leading up to January 6th. *E.g.,* Ex. 403 and 404 ("Hold the line, Patriots! Trump has got this! . . . Biden will never take office!" / "Or we show up at the Capital with guns like we've done in GA!").[3]

In Parler posts not introduced at trial, Calhoun's rhetoric was more violent:

- October 29, 2020: "I'm a lawyer, and a believer in law and order, but I'm here to tell you there are [i]s only one remedy for what ails this country - about 10 - 20 million of these rioting, racist communists need to die. Then the rest will straighten up. Until that happens we're wasting our time."

---

[3] All spelling and typographical errors, including the periodic misspelling of the word "Capitol," are those of Calhoun.

- November 6, 2020: "If you believe America elected Creepy Joe and his fake Negro bitch running mate, then put on your mask and STFU because we're coming for you motherfuckers! This stolen election is a fraud. Trump won! And when the Supremes rule, we are going to deal with the communists! Kill 'em all and let God sort 'em out!"

- November 17, 2020: "I feel like I'm already a member of Proud Boys, the Three Percenters and Oath Keepers in spirit, although I'm not an official member of any of these groups. I salute them all! And, whenever they go to a fight within driving distance of my home (read Atlanta, Macon, Columbus or Albany) I'm going to be there with them beating the crap out of these rioting communist assholes, or taking them out other ways . . . ."

- November 30, 2020: "If the Courts and the Legislature can't fix the steal, and the rule of law fails us, and nothing is left but this communistic Banana Republic mockery of Democracy, then it will be time for GA Patriots to resort to their remedy of last resort - the violent overthrow of our State Government."

- November 30, 2020: "When Conservative Americans 'riot', we don't loot, we topple Governments!"

- December 1, 2020: "The time is coming when the rule of law will no longer be in place, and when it happens you'll know it. That's when we occupy the Capital in force and start executing these criminals. The cabal of communists and Never Trumper criminals in Atlanta have severely miscalculated their position - their lives are rapidly becoming forfeit to long prison sentences - but if that fails then they deserve the mob's justice!"

In the weeks before the certification of the Electoral College vote, Calhoun called for action

on Facebook. And Calhoun's violent rhetoric reached an audience: he boasted approximately 5,000 Facebook followers at the time. Trial Tr. at 215. On December 22, 2020, Calhoun posted to Facebook: "See you in Washington on Jan. 6!" Ex. 406. He followed up on December 29th: "Being physically present in Washington on January 6 is of key importance." Ex. 407. In the context of his prior posts, these were not calls to protest; they were calls to riot. On January 4, 2021, Calhoun posted again about his intent to go to Washington, D.C., and explained why: "Headed to D.C. to give the GOP some back bone - to let them know this is their *last chance to Stop the Steal* - or they are going to have bigger problems than these coddled Antifa burning down their safe spaces. DC announced it is 'banning guns' when *we storm the Capitol tomorrow*. LoL - guns are already banned in DC. Very illegal. Whether the police can enforce their gun laws depends on how many armed Patriots show up[.]" Ex. 408 (emphasis added). In the same post, he noted that Washington, D.C. does not prohibit "carrying a tomahawk as long as it is not used offensively!", implicitly encouraging his followers to arm themselves on January 6, 2021. *Id.* The next day, Calhoun posted on Facebook regarding Georgia's disputed electoral votes in the 1800 presidential election, drawing parallels with the 2020 election, and stating specifically: "As the VP and President of the Senate, Jefferson counted the votes for himself. So this is a precedent for Pence being authorized to count disputed votes in his own election . . . The VP isn't just performing a clerical function, judgment and discretion has to be exercised where the votes are contested. That's under the 12th Amendment." Ex. 503.

In other words, long before he came to Washington, D.C., Calhoun knew that Congress was meeting to certify the results of the Electoral College vote, understood the nature of the

proceeding, and planned to disrupt it by storming the Capitol. These plans existed apart from anything said at the former President's rally.

***Calhoun's Approach and Entrance into the Capitol Building on January 6th***

Calhoun entered restricted Capitol grounds on the West side. He filmed his approach on his cellphone, capturing a chaotic scene of rioters and smoke rising up from the crowd. In one video, Calhoun walked toward the Capitol and stated, "Alright we're at the Capitol. We just gained access to the second floor. They've stormed across the barricade. You can see it right up here . . . They're taking it . . . they're taking the Capitol." Ex. 603.



***Exhibit 603 (Screenshot from Timestamp 00:05)***

Calhoun proceeded up the stairs next to the inauguration stage and walked across the Upper

West Terrace toward the Senate Wing Doors. As he crossed the Upper West Terrace, Calhoun filmed the scene and himself, stating, in part: "This is it. We're storming the Capitol." Ex. 604. Calhoun entered the Capitol building through the Senate Wing Doors at 2:19 p.m., only six minutes after the initial breach. As he entered the building, an alarm blared and broken glass was apparent.



Ex. 605.

***Exhibit 605 (Screenshot from Timestamp 00:02)***

While inside the Capitol, Calhoun made his way to the Crypt, Rotunda, and the outside of former Speaker Pelosi's Office. He continued to film himself while inside. In one video, Calhoun was in the Crypt opposite a line of police officers who were attempting to hold back the rioters. Ex. 607. Calhoun stated: "Looks like we're about to push through these cops. We'll see what

happens. The crowd's really pissed." Ex. 607. According to Captain Mendoza's testimony at trial,

the rioters ultimately overran that police line.

 

*Exhibit 607 (Screenshots from Timestamps 00:00 and 00:08)*

Calhoun also filmed himself walking down a hallway lined with Members' offices as other

rioters yelled and banged on the walls and doors. Calhoun is heard in the video saying, "We're in.

We're on the second floor of the Capitol. We're looking for people. This is really remarkable. It's

on." Ex. 608. He also made it to the outside of Nancy Pelosi's office, which he captured on his

cellphone. Ex. 632.




*Exhibit 608 (Screenshot from Timestamp 00:20)*              *Exhibit 632*

Calhoun ultimately exited the Capitol building through the Rotunda Doors at approximately 2:36 p.m.

### *Calhoun's Social Media Posts on and after January 6th*

Calhoun continued to post on social media on January 6th. On Parler, he posted: "There are a lot of people here – the crowd is surging towards the Capital[.]" Ex. 410. He followed up with, "The cops are using mace on us at the front of the Capitol[.]" Ex. 411. And then, "We[] have busted through into the Capitol and taken it[.]" Ex. 412. On Facebook, he posted, in part: "We physically took control of the Capital building in a hand to hand hostile takeover. We occupied the Capitol and shut down the Government – we shut down their stolen election shenanigans." Ex.

506.

Calhoun also wrote:

> Patriots have taken the Capitol building. We overran multiple police barricades and swarmed the building. We busted through. Thousands of us swarmed in. There was a last police barricade inside, and we packed in right up to them. Someone yelled push through, so we did, and the shock of our momentum brushed them aside. Some people were bleeding pretty badly at that point.
>
> After we had overrun that last police barricade, the momentum caused a bad crush at one point but carried the vanguard through several smaller doors and down halls as we swarmed Congress yelling the names of various members. Then we swarmed upstairs through the Rotunda admiring the amazing artwork but at the same time looking for members of Congress, as by this time we physically owned the Capitol. All law enforcement had retreated to the perimeter, and even more thousands were trying to push in.
>
> And get this, the first of us who got upstairs kicked in Nancy Pelosi's officer door and pushed down the hall toward her inner sanctum, the mob howling with rage. Crazy Nancy probably would have been torn into pieces, but she was nowhere to be seen.
>
> Then a SWAT team showed, and we retreated back to the Rotunda and continued our hostile takeover of the Capitol building. There was such a push of even more patriots coming in to the Capitol that we couldn't get out for about 20 minutes.
>
> If this steal doesn't get fixed, there's talk of patriots coming back. This time we're fully armed for war. We mean business. We proved today that we are in control and we outnumber the deep state 10,000 to 1. They can't stop us.

Trial Tr. at 396:14-397:20 (reading Ex. 508 in full and noting it as similar to Ex. 414).

The following day, after having time to reflect on his conduct, Calhoun remained proud of

his actions. On January 7, 2021, Calhoun posted to Parler:

- "I want to be clear about what happened today. This was not Antifa masquerading as

Patriots who stormed the Capitol. These were Patriots - thousands and thousands of them."

Ex. 418.

- "The People who stormed the Capitol are heroes." Ex. 419.

- "This was an historic moment for the USA. I think that on the whole, it helped." Ex. 420.

In a January 9, 2021 Parler post, which was not admitted at trial, Calhoun continued to defend his

actions while trying to paint rioters' actions as peaceful: "From where I was standing, no one broke

anything, no one assaulted anybody, no one defecated or did anything untoward like that. We['re]

[sic] Americans peacefully protesting a stolen election doing what we could at that time and

place[.]"

Even months later, while representing a client in a court proceeding in Cordele, Georgia,

Calhoun gave a full-throated defense of his own conduct: "He [the client] cannot get past the fact

that I was in Federal Detention for two months, for entering the Capitol, and I have had enough.

My position on that is, somebody had to do it, okay? I would do it again a hundred times, if I, if I

were in the same situation, that's just how I feel about it." Ex. 206.

## C.    Calhoun's Trial Testimony

At trial, Calhoun testified in his own defense, claiming, despite evidence to the contrary,

that he did not know he was not authorized to be in the Capitol on January 6th, *e.g.,* Trial Tr. at

230 ("I thought that was, like where you were supposed to walk through"), that he believed the

electoral vote count was already over, Trial Tr. at 235-36, 250, and that he was partaking in a

peaceful protest, Trial Tr. at 245. He also attempted to separate his role from the actions of the

mob, claiming that he was merely a witness fulfilling a journalistic function. *E.g.* Trial Tr. at 278:1-

4, 293:20-294:1.

Those claims were false. And transparently so, given Calhoun's clear and unambiguous statements before, during, and after January 6th. Even before the election, Calhoun called for "Patriots" to storm Washington. Ex. 400. He stressed that "[b]eing physically present in Washington on January 6 is of key importance," noting that he and his compatriots "have no other realistic option to communicate **our** unwavering intent to demand fair elections now and forever – or else." Ex. 407 (emphasis added). He noted that the ability of the police to enforce local gun laws "depends on how many armed Patriots show up." Ex. 408. His real-time posts about the riots are all written in the first-person; when he writes about "patriots" and the "mob howling with rage," he included himself in the mob. Ex. 411, 412, 414. And he was proud of what he had done, writing "[t]he People who stormed the Capitol are heroes." Ex. 419.

The Court found that Calhoun provided false testimony when he claimed to lack knowledge that he was unauthorized to be in the Capitol building, Trial Tr. at 385:25-386:3; when he refused to agree that there was a line of police officers, *id.* at 387:2-3; when he denied seeing barricades and breaks in barricades, *id.* at 386:10-21; and when he claimed he did not see broken glass. *Id.* at 386:5-9. Additionally, the Court specifically found that Calhoun was evasive, shaded his testimony, and "flat out testified falsely" in response to certain questions. *Id.* at 388:15-18. And, through its verdict, the Court found that he lied in claiming to lack the intent to obstruct the certification of the Electoral College vote. *Id.* at 386-88, 394-98. Given his false testimony before the Court, the government seeks the adjustment for Obstructing or Impeding the Administration

of Justice pursuant to U.S.S.G. § 3C1.1.

### D.  Calhoun's Georgia Disciplinary Proceedings

Following his conviction by this Court, Calhoun continued to deny responsibility for his actions on January 6th. On June 21, 2023, the Georgia State Bar conducted a disciplinary proceeding to suspend Calhoun's bar license due to his felony conviction in this matter. Exhibit C.  Georgia's bar rules and case law provide for the automatic suspension, pending appeal, of any attorney convicted of a felony. *Id.* at 15:14-17:23 (opening statement by the Georgia State Bar). To avoid suspension, Calhoun: (1) argued that a conviction following a bench trial is not a "verdict" and thus does not trigger suspension, *id.* at 18:16-27:14; (2) argued that Georgia state law, and not Federal law, should govern whether his conduct was felonious, *id.* at 31:18-36:9; (3) attempted to relitigate the facts of this case, *see id.* (throughout); and (4) argued that suspending his bar license would deprive his clients of their right to chosen counsel, *id.* at 10:19-11:20, despite representing to this Court his intent to wind down his law practice.

In attempting to relitigate this case, Calhoun testified—but failed to acknowledge, much less engage with—this Court's adverse credibility findings. Instead, he testified that, on January 6th, as an attorney, he was "very mindful of . . . bright lines that we don't cross." *Id.* at 55:6-13. Calhoun claimed that, when he ascended the stairs to the Capitol's Upper West Terrace, "I resolved then that I'd take a misdemeanor for the cause . . . [b]ut I know I did not commit a felony." *Id.* at 55:25-56:22. Calhoun claimed that he was merely exercising his First Amendment rights and that "[t]he government is trying to set a precedent . . . for prosecuting and convicting a lawyer for thinking the wrong way." *Id.* at 57:25-58:9. Commenting on this Court's findings of fact, Calhoun

said "and this is what the judge was inquiring about, you know, what did I do that was different from those people who didn't get charged with a felony?" But, in a manner consistent with his false and evasive trial testimony, Calhoun framed this rhetorical question to suggest that this Court questioned his guilt, when—as he well knew—it was looking ahead to considerations of sentencing.

Calhoun also demonstrated his continued lack of remorse for his conduct on January 6th. When asked by the attorney for the Georgia State Bar if "we all [can] assume you have no remorse for going, January 6th, to the Capitol?", Calhoun answered, "Why would I have remorse?" Exhibit C at 61:14-17. When asked a similar question by his own attorney, Calhoun again answered, "No, I do not." *Id.* at 62:10-11.

## III.    THE CHARGES

On January 12, 2022, a federal grand jury returned a Superseding Indictment charging Calhoun with five counts: (1) Obstruction of an Official Proceeding and Aiding and Abetting, 18 U.S.C. §§ 1512(c)(2) and 2; (2) Entering and Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1); (3) Disorderly and Disruptive Conduct in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(2); (4) Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D); and (5) Parading, Demonstrating, or Picketing in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G). ECF No. 83.

On March 20, 2023, this Court convicted Calhoun of each of those offenses following a bench trial. ECF 163.

## IV.    STATUTORY PENALTIES

Calhoun now stands to be sentenced on the five counts of the Superseding Indictment. As noted by the Presentence Report issued by the U.S. Probation Office, Calhoun faces the following penalties:

- Count One (Obstruction of an Official Proceeding): up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

- Count Two (Entering and Remaining on a Restricted Building of Grounds): up to one year imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25.

- Count Three (Disorderly and Disruptive Conduct in a Restricted Building or Grounds): up to one year imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25.

- Count Four (Disorderly Conduct in a Capitol Building): up to six months imprisonment, a fine up to $5,000, and a mandatory special assessment of $10.

- Count Five (Parading, Demonstrating, or Picketing in a Capitol Building): up to six months imprisonment, a fine up to $5,000, and a mandatory special assessment of $10.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should

be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.

The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful

study based on extensive empirical evidence derived from the review of thousands of individual

sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at

49. The government has calculated Calhoun's Guidelines range as follows:

Count One: 18 U.S.C. §§ 1512(c)(2) and 2

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[4] | +3 |
| U.S.S.G. § 3C1.1 | Obstructing or Impeding the Administration of Justice | +2 |
| | **Total** | **19** |

Count Two: 18 U.S.C. § 1752(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | Special Offense Characteristic (Restricted Building or Grounds) | +2 |
| U.S.S.G. § 2B2.3(c)(1) | Cross Reference (Intent to Commit Felony) | |
| U.S.S.G. § 2X1.1(a) | Base Level Offense (Adjusted – From Count One) | 17 |
| U.S.S.G. § 3C1.1 | Obstructing or Impeding the Administration of Justice | +2 |
| | **Total** | **19** |

---

[4] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. The evidence presented at trial shows that Calhoun went to Washington, D.C. and joined in the riot to stop the certification of the Electoral College vote count. Further, the riot resulted in evacuations, vote count delays, officer injuries, and more than 2.9 million dollars in losses. As described herein, law enforcement officials from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

Count Three: 18 U.S.C. § 1752(a)(2)

| | | | |
|---|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | | 10 |
| U.S.S.G. § 3C1.1 | Obstructing or Impeding the Administration of Justice | | +2 |
| | | **Total** | **12** |

Counts Four and Five:    Class B misdemeanors to which the Sentencing Guidelines do not apply. *See* 40 U.S.C. § 5109(b); 18 U.S.C. § 3559(a)(7); U.S.S.G. § 1B1.9.

**Total Adjusted Offense Level:[5]                                    19**

The U.S. Probation Office calculated Calhoun's criminal history as Category I, which is not disputed. PSR ¶ 56. Further, the U.S. Probation Office and the government agree that a two-point adjustment is appropriate pursuant to U.S.S.G. § 3C1.1 based on Calhoun's false testimony at trial. *Id.* ¶ 33. Significantly, Calhoun's testimony was littered with materially false statements that were directly contradicted by other evidence, including evidence Calhoun himself created (*e.g.,* cellphone videos, social media posts). Accordingly, based on the government's calculation of Calhoun's total adjusted offense level, at 19, Calhoun's Guidelines range is 30 to 37 months of imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

---

[5] Under U.S.S.G. §3D1.2(a) and (c), "closely related counts" group. Counts One, Two, and Three comprise a single group under U.S.S.G. §3D1.2(a) and (b) because the victim of each count is Congress. Under U.S.S.G. §3D1.3(a), the offense level for a group of closely related counts is the highest offense level of the counts in each group. The highest offense level is 19 (for Counts One and Two). Therefore, the combined offense level for the group is 19.

**A.        Nature and Circumstances of the Offense**

As shown in Section II(B) of this memorandum, Calhoun's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification of the Electoral College vote, frustrated the peaceful transition of Presidential power, and almost threw the United States into a Constitutional crisis. Calhoun was vocal about his plans to travel to Washington, D.C. to subvert the certification on January 6th, and that was exactly what he did. When he arrived at the Capitol, Calhoun witnessed barriers, chaos, and violence, and despite those red flags—or more accurately *because* of the opportunity such chaos and violence presented— Calhoun proceeded through restricted Capitol grounds and into the Capitol building. His presence inside, along with the hundreds of other rioters, stopped Congress from continuing the Joint Session to certify the electoral votes, just as Calhoun had anticipated. The nature and circumstances of Calhoun's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 33 months of imprisonment.

**B.  Calhoun's History and Characteristics**

Calhoun is a unique defendant in that he has been a practicing criminal defense attorney for decades. As he testified at trial, he works "[p]rimarily state cases, misdemeanor and felony. Everything from, you know, minor misdemeanors to murder cases." Trial Tr. at 257:19-20. His training and experience make his participation in the Capitol riot all the more egregious. As a barred attorney, Calhoun took an oath to support and defend the Constitution of the United States, as well as to "truly and honestly, justly and uprightly conduct himself as a member of this learned profession[.]" Rules Governing Admission to the Practice of Law, Supreme Court of Georgia,

Section 16 (Revised November 2022). Calhoun failed in both respects on January 6th and in how he conducted himself before this Court.

Although Calhoun has no prior criminal history and, to the government's knowledge, did not assault anyone on January 6th, his rhetoric leading up to the 2020 presidential election and January 6th is thick with threats of violence and foreshadowing of a hostile takeover. At trial, the government presented evidence that, on November 4, 2020, Calhoun posted on Parler: "We have a communist revolution happening before our very eyes to steal this election - it's obvious. Americans get ready to rise up and kill the democrat communists before they do it to us." Ex. 402. On January 4, 2021, Calhoun posted, in part: "DC announced it is 'banning guns' when we storm the Capitol tomorrow. LoL-guns are already banned in DC. Very illegal. Whether the police can enforce their gun laws depends on how many armed Patriots show up." Ex. 408.

Calhoun's explanation of his own conduct—that he never planned to go to the Capitol, and that he was "performing a journalistic function"—is, like other statements by him, false. Rather, Calhoun falsely claimed that the election was stolen, knew the significance of the proceeding on January 6th, and intended to physically stop the certification through a hostile takeover of the Capitol. His actions were illegal and directly contrary to the oath that he took to protect the Constitution. Moreover, since the conclusion of trial, Calhoun has continued to deny responsibility for his conduct and has attempted to evade the professional consequences of his conviction.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Calhoun's criminal conduct on January 6th was the epitome of disrespect for the

law—ironic given Calhoun's profession and self-proclaimed belief in the rule of law. This factor carries even more importance given Calhoun's lack of remorse for his actions and his false testimony.

Before this Court, Calhoun downplayed his conduct and that of other rioters on January 6th, maintaining that his actions were mere "civil disobedience." *E.g.,* Ex. 209 at 58:7-8 ("On the other hand, you know, this is – this was civil disobedience."). That Calhoun characterized his behavior as civil disobedience further evidences his knowledge that his behavior was unlawful.[6] Calhoun's disrespect for the law extended to his "shaded" and false testimony before this Court. Trial Tr. at 388:15-18. A significant term of imprisonment is required due to the seriousness of Calhoun's conduct leading up to and on January 6, 2021, and is especially appropriate given Calhoun's position in the legal community and lack of respect for the law and this Court.

---

[6] Civil disobedience is the refusal to obey a law perceived as unjust. *See*, *e.g.*, CIVIL DISOBEDIENCE, Black's Law Dictionary (11th ed. 2019) ("A *deliberate but nonviolent act of lawbreaking* to call attention to a particular law or set of laws believed by the actor to be of questionable legitimacy or morality.") (emphasis added); *United States v. Obuszewski*, 334 Fed. Appx. 330, 331-32 (D.C. Cir.) (evidence of plan to engage in civil disobedience by protesting on the White House sidewalk admitted as proof of knowledge and intent). A claim that conduct was civil disobedience is not a defense to criminal prosecution. *E.g., We the People v. United States*, 2005 U.S. Dist. LEXIS 20409 at *5-6 (D.D.C. 2005) (people engaging in civil disobedience through tax protests have no "right to withhold money owed to the government and to avoid governmental enforcement actions because they object to government policy.") As a lawyer, Calhoun understood this, and his claims to the contrary are an insult to the Court's intelligence.

**D.    The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. As outlined above, Calhoun's lack of remorse continues to date. Calhoun's lack of remorse and failure to acknowledge the seriousness of his conduct, combined with his violent rhetoric leading up to January 6th, requires a sentence sufficient to specifically deter Calhoun from participating in future, violent riots.

**E.    The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007)

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

(quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Id.* at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

**F.      Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 49 ("[A]s far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of

sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[9]

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[9] A routinely updated table providing additional information about the sentences imposed on other

After issuing its verdict, this Court noted that it had the authority and duty to impose a proportional and just sentence that does not result in unwarranted sentencing disparities. As discussed above, the government agrees that Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." But a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020). The government respectfully disagrees with the Court's suggestion that the facts of this case are in line with this Court's misdemeanor January 6th cases. [10] There are significant differences between Calhoun and those misdemeanor defendants, including Calhoun's co-defendant, whom this Court previously sentenced. Failing to account for those differences would itself lead to unwarranted sentencing disparities between similarly situated defendants.

Calhoun's conviction under § 1512 required proof beyond a reasonable doubt that he: (1) obstructed or impeded an official proceeding;[11] (2) intended to obstruct or impede the official

---

Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

[10] Attached as Exhibit A is a list of the misdemeanor sentences issued by the Court.

[11] For purposes of 18 U.S.C. § 1512, "a proceeding is a particular thing done: affair, transaction, negotiation, as in 'an illegal proceeding' or 'business proceedings.'" *United States v. Miller*, 589 F. Supp. 3d 60, 66 (D.D.C. 2022) (internal quotations omitted). The term "official proceeding" includes a proceeding before the Congress. *United States v. Fischer*, 64 F.4th 329, 342 (D.C. Cir. 2023) (quoting 18 U.S.C. § 1515(a)(1)(B)).

proceeding; (3) acted knowingly, with awareness that the natural and probable effect of his conduct would be to obstruct or impede the official proceeding; and (4) acted corruptly. By contrast, the majority of this Court's January 6th misdemeanor cases involved violations of 40 U.S.C. §§ 5104(e)(2)(D) or (G), which require proof only that the defendant obstructed, impeded passage, or paraded, demonstrated, or picketed in any of the United States Capitol Buildings and acted willfully and knowingly. Further, in the two § 1752 misdemeanor cases this Court has sentenced, *United States v. Verden Nalley*, 1:21-CR-116, and *United States v. Treniss Evans III*, 1:21-CR-225, the only elements of those 18 U.S.C. § 1752(a)(1) violations were that the defendant entered and remained in a restricted building or ground and did so knowingly.

Thus, while a violation of § 1512 might involve similar *conduct* to a misdemeanor under § 1752 or § 5104, it requires different *intent*. A felony conviction under § 1512 requires proof that the defendant specifically intended to obstruct or impede an official proceeding, and that they acted with awareness that the natural and probable effect of their conduct would be to obstruct the official proceeding, while the misdemeanor offenses under 40 U.S.C. § 5104 and 18 U.S.C. § 1752 do not.[12]

---

[12] To be sure, there is one misdemeanor offense among those that are frequently charged in the January 6th cases that has an element of intent to cause harm: 18 U.S.C. § 1752(a)(2). That statute requires the government to prove that the defendant, "knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions." But that's far from analogous to the intent requirement of 18 U.S.C. § 1512(c)(2), which requires the government to prove the defendant "corruptly . . . obstructs, influences, or impedes," not merely any "Government business or official function," but an "official proceeding." And an "official proceeding" is delineated in 18 U.S.C. § 1515 to four types of proceedings that are core functions of the federal government and that private entities do not

This distinction is critical. For example, although both involuntary manslaughter and premeditated murder are unlawful homicides resulting in the loss of a human life, premeditated murder involves the intent to kill but involuntary manslaughter does not. Federal criminal law and the law of every state punishes premediated murder more harshly than involuntary manslaughter— not because the defendant's conduct resulted in death, but because of the defendant's intent to cause that result. *Compare* 18 U.S.C. § 1111(b) (mandatory penalty for first degree murder is death or imprisonment for life) *with* 18 U.S.C. § 1112(b) (maximum prison sentence for involuntary manslaughter is 8 years).

Regardless of any similarities in conduct, where evidence of intent to obstruct the certification of the 2020 election exists beyond a reasonable doubt, the defendant is guilty of a crime that Congress has deemed to be a felony. As this Court has observed, the January 6th rioters "caused great harm to our democracy." *See United States v. Kevin Creek*, 21-CR-645 (DLF) (Sent. Tr., at 64). But while all those who caused that harm deserve punishment, those who intended that harm deserve greater punishment. This Court presided over the first January 6th trial: *United States v. Guy Reffitt*, 21-cr-31 (DLF). While Reffitt carried a firearm on Capitol grounds, he did not use or otherwise brandish it, and did not engage in violence. At sentencing, this Court discussed how Reffitt was distinct from other defendants, focusing on Reffitt's intent, not his conduct:

---

conduct. Those are "federal judicial proceedings," "proceedings before Congress," "proceedings before a Federal Government agency," and "proceedings involving the business of insurance whose activities affect interstate commerce." 18 U.S.C. § 1515(1)(A)-(D). Congress appropriately treated the obstruction of those core proceedings as significantly more serious than impeding or disrupting any government business or function, which could include activities as relatively pedestrian as the delivery of a single piece of mail or the review of a single census form by an employee of the United States Census Bureau.

> [I]n some ways, Mr. Reffitt is in a class of his own with regard to the purpose, the stated purpose here, which I don't think I've heard quite as explicitly, at least in the cases I've reviewed, as he stated it in terms of literally overthrowing the elected officials, removing them, and coming down here for the constitutionalist judges to install a new government. That seems, again based upon my review of the record, that that's notable and different than others.

(Sent. Tr. at 163). The Court also noted Reffitt's "highly disturbing statements before, during, and after January 6" and once again focused on Reffitt's intent, noting "his goal was to drag the corrupt legislators out of the Capitol and to bring them, in his words, to bring, quote, the people's house down." *Id.* As the Court knows, Reffitt did not actually drag any legislators out of the Capitol. Nevertheless, it was appropriate to consider Reffitt's "goal" and "purpose" in determining his sentence.

It is precisely this kind of evidence—of specific intent to interfere with the election, by employing violence, if necessary—that distinguishes Calhoun from his misdemeanor co-defendant, and the other misdemeanor defendants this Court has sentenced. None of these misdemeanor defendants discussed in detail their understanding of the certification process and their desire for Vice President Pence to stop the certification. None of them announced, as Calhoun did, that: "the communists are trying to steal the election-it's obvious" followed by "[w]e're going to go door to door and *execute* the fucking communists." Ex. 500 (emphasis added). Nor did they discuss the murder of their political opponents, *e.g.* Ex. 402, 414, 500, 508, or announce plans to storm the Capitol even before the former President's rally." Ex. 408. None of them discussed Washington, D.C.'s gun laws, as Calhoun did, or predicted that the police would have difficulty enforcing those laws if enough "*armed* Patriots show up." *Id.* (emphasis added). None of them

28

encouraged others to bring a tomahawk to the Capitol to get around the gun laws, as Calhoun did. *Id.* And none of them proudly proclaimed, the way Calhoun did, that they had "busted through into the Capitol and taken it", Ex. 412, or bragged that they "occupied the Capitol and shut down the Government", Ex. 506.

Significantly, § 1512 does not require an intent to engage in violence. In its post-verdict statements, the Court indicated that if the government could produce additional evidence that Calhoun was likely to act with violence, the Court might be persuaded that a more substantial sentence would be warranted. Trial Tr. at 404 at 19-24. While evidence of violent intent is certainly an aggravating factor, the government submits that interfering with the peaceful transfer of power and causing "great harm to our democracy" is a serious crime regardless of whether a defendant used or intended violence.[13]

Recently, Judge McFadden addressed the importance of the intent element of § 1512 and how it renders non-violent conduct, which would otherwise constitute a misdemeanor, into a serious felony warranting a significant sentence. In *United States v. Hatchet Speed*, 22-CR-244, Judge McFadden stated that Speed did not engage in acts of violence or destruction, and that "his conduct was frankly comparable to defendants who the Government has only charged with

---

[13] The evidence does explicitly demonstrate that Calhoun had an intent to be violent on January 6. In addition to Calhoun's extremely violent rhetoric before January 6th regarding "storm[ing] the Capitol," Calhoun actually went to the restricted grounds of the Capitol on January 6 and into the Capitol building (where no lawful protests were taking place); he recorded and celebrated the chaos and violence going on; and he declared to the world, as other rioters yelled and banged on the walls and doors in a hallway lined with Members' offices, "We're on the second floor of the Capitol. We're looking for people." Simply because he did not find "people" (members of Congress) does not mean he lacked a violent intent, merely that he did not come face-to-face with those he targeted.

29

misdemeanors." (Sent. Tr. at 19). Nevertheless, Judge McFadden imposed a four-year prison sentence and made clear that the sentence was warranted by the defendant's intent to obstruct the certification process, telling Speed:

> [Y]our actions, standing alone, were not particularly egregious. You weren't involved in any violence. You didn't destroy anything and you didn't enter sensitive areas of the building. I agree with your attorney's arguments on this point. However, your intentions were quite troubling. It is clear from the evidence the Government introduced at trial that you're an intelligent man with a nuanced understanding of the certification process. You were quite happy to stay outside as long as things were going your way. But when you thought the vice president was betraying you, you were also very willing to break in. And you made it clear that you only left because you thought you had achieved your purpose.

*Id.* at 35 (emphasis added).

Other courts have similarly held that a non-violent violation of § 1512 is nevertheless a serious offense warranting significant punishment. Attached as Exhibit B is a list of § 1512 convictions in January 6th cases where the defendant did not himself engage in violence. With the exception of one outlier,[14] sentences have ranged from a low of 8 months to a high of 49 months imprisonment, with the vast majority of prison sentences exceeding one year. For example, in *United States v. Reid*, 21-CR-316, this Court sentenced the defendant to 37 months of incarceration for his violation of § 1512. Like Calhoun, Reid did not engage in any violence.[15]  But also like

---

[14] In *United States v. Matthew Wood*, 21-CR-223 (APM), Judge Mehta imposed a sentence of 12 months of home detention as part of 36 months of probation for a defendant convicted of violating § 1512. Judge Mehta made clear that his sentencing determination was influenced in large part by the defendant's youth (age 23): "in Mr. Wood, I think we have somebody who's somewhat unique in that he is young" (Sent. Tr. at 66).

[15] Reid damaged property in a bathroom, but the Court rejected the application of a sentencing enhancement for this conduct, finding it was unrelated to Reid's intent to interfere with the certification.

Calhoun, Reid's intent to interfere with the certification of the election was clear from both his conduct and his social media.

In *United States v. Matthew Bledsoe*, 21-CR-204 (BAH), the defendant was convicted of a felony violation of § 1512, as well as misdemeanors under § 1752 and § 5104. In sentencing Bledsoe to 4 years of imprisonment, Judge Howell noted that Bledsoe "didn't come prepared for violence that day." *United States v. Matthew Bledsoe*, 21-CR-204 (BAH), Sent. Tr. at 113. Nevertheless, Bledsoe's intent was clear: "you were there to put a halt to the certification proceedings that were supposed to take place in Congress." *Id.* at 114. Similarly, in *United States v. Douglas Wright*, 21-CR-341 (CKK), the defendant was convicted of § 1512, and though he organized two charter buses to Washington, D.C., he did not engage in any violence. Nevertheless, Wright's social media made clear that he "came to D.C. to disrupt the certification proceeding." *United States v. Douglas Wright*, 21-CR-341 (CKK), Sent. Tr. at 58. Judge Kollar-Kotelly sentenced Wright to 49 months of imprisonment after noting that "even though your role was fairly limited in terms of what your physical actions were, as opposed to the rhetoric, but your presence in the mob of rioters, your rhetoric helped create a momentum of violence." *Id.* at 51.

Simply put, in the misdemeanor cases listed in Exhibit A, the evidence did not include proof beyond a reasonable doubt of an intent to corruptly interfere with the certification of the election.  In Calhoun's case, the evidence did. Thus, Calhoun is not similarly situated to these misdemeanor defendants.

Significantly, every misdemeanor case this Court has sentenced was the result of the

defendants pleading guilty pursuant to a plea agreement and accepting responsibility.[16] As Judge

Howell recently noted, cases resolved by guilty plea are not suitable comparators to cases resolved

by a conviction at trial:

> Defendants convicted through guilty pleas are granted more leniency than those who are convicted at a . . . trial, period. By virtue of their guilty pleas, the defendants have demonstrated an acceptance of responsibility and accountability for their actions and, thus, get credit under the guidelines with the usual three-offense level reduction for a lower guideline sentencing range.
>
> This is totally appropriate because such acceptance of guilt shows the Court that the defendant's knowledge – that the defendants have acknowledged the wrongful and unlawful nature of their actions, which are very important considerations in assessing important deterrence factors under 3553(a) . . .
>
> This defendant exercised his right to go to . . . trial and, by his testimony, indicated no remorse, no acknowledgment of the wrongfulness of his offense conduct on January 6th. He may still, today, remain indignant, to quote him, about his treatment and the treatment of others, rioters, at the U.S. Capitol on January 6th. These are important considerations in assessing the need for deterrence.

*United States v. Gillespie*, 1:22-cr-00060 (BAH), Sent. Tr. 04/14/2023 at 98-99. In contrast to his

co-defendant and to the misdemeanor defendants listed in Exhibit A, Calhoun refused to accept

responsibility, took the witness stand, and lied under oath.

Based on his conduct, his intent, and the charge of conviction, Calhoun is similarly situated

---

[16] This, too, puts Calhoun in a substantially different situation from the misdemeanor defendants who have been sentenced by this Court. If Calhoun had accepted responsibility by pleading guilty, and if he did so promptly, he would have been entitled to a three-level reduction pursuant to U.S.S.G. § 3E1.1. His decision to lie under oath resulted in two additional offense levels, pursuant to U.S.S.G. § 3C1.1. Thus, if Calhoun had accepted responsibility and not perjured himself, his offense level would have been 14, and his Guidelines range would have been 15 to 21 months.

to *Speed, Wright*, and *Reid*, and not this Court's misdemeanor defendants. Sentencing Calhoun similarly to this Courts' misdemeanor defendants would therefore create an unwarranted sentencing disparity with other § 1512 defendants who engaged in similar conduct *and had the same intent* as Calhoun, and would fail to address the sentencing factors pursuant to 18 U.S.C. § 3553(a).

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes are relevant here. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to only certain offenses "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), such as a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512

(citation omitted). Because Calhoun was convicted of violations of 18 U.S.C. 1512(c)(2) and (2), 18 U.S.C. 1752(a)(1) and (2), and 40 U.S.C. 5104(e)(2)(D) and (G), none of which are crimes of violence or offenses against property, the MVRA does not apply. But because Calhoun was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[17]

---

[17] Both statutes permit the sentencing court to decline to impose restitution when doing so would

34

Because Calhoun engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Calhoun responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Calhoun to pay $2,000 in restitution for his convictions on Counts One through Five. This amount fairly reflects Calhoun's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the

---

"complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

**VIII.    CONCLUSION**

For the reasons set forth above, the government recommends that the Court impose a sentence of 34 months of imprisonment, 36 months of supervised release, and that Calhoun be ordered to pay $2,000 in restitution, and the mandatory assessments of $100 for his felony conviction (Count One), $25 for each Class A misdemeanor conviction (Counts Two and Three), and $10 for each Class B misdemeanor conviction (Counts Four and Five).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    *Sarah C. Martin*
Sarah C. Martin
Christopher Brunwin
Assistant United States Attorneys

36